**Robert M. BEATTIE, Jr.,**
**Plaintiff–Appellant,**

v.

**The BOEING COMPANY,**
**Defendant–Appellee.**

**No. 92–3314.**

United States Court of Appeals,
Tenth Circuit.

Dec. 30, 1994.

James S. Phillips, Jr. of Phillips & Phillips, Wichita, KS, for plaintiff-appellant.

Timothy B. Mustaine (Mary Kathleen Babcock and Susan Lee Smith, on the brief), of Foulston & Siefkin, Wichita, KS, for defendant-appellee.

Before BRORBY, HOLLOWAY and KELLY, Circuit Judges.

HOLLOWAY, Circuit Judge.

Plaintiff-appellant Robert A. Beattie, Jr. (Beattie) appeals from a summary judgment entered in favor of defendant-appellee The Boeing Company (Boeing) on Beattie's *Bivens*[1] claim for violation of his First Amendment right of free speech.[2] The judgment followed an unpublished Memorandum and Order. We affirm.

## I

In 1984 Beattie was employed as a firefighter with the Boeing Fire Department. Appellant's Appendix (App.) at 50, 175. In 1986 Boeing contracted with the United States to build two Air Force One planes for the use of the President of the United States. *Id.* at 51. The contract provided that the planes be constructed in a secured area into which only persons with access clearance could enter. *Id.* at 51–52.

Under the contract there were two types of access clearance: unescorted and escorted (i.e., access in the company of a person with unescorted access clearance). Only the Air Force could grant unescorted access. However, Boeing could grant escorted access, subject to Air Force override. *Id.* at 137–139, 141, 143, 200, 205–07, 222–23, 226. Applicants for either type of access clearance were subject to a background check to determine if they satisfied the clearance criteria set forth in the contract including "unquestioned loyalty to the United States." *Id.* at 324. The criteria for both types of access were specified in the contract's Annex 2, on special security requirements. App. at 263a, 324–25. Physical access to the Air Force One area was monitored and controlled by Air Force guards, assisted by Boeing employees. *Id.* at 143–44, 279–83, 286.

The parties disagree as to whether Beattie ever had any access clearance, whether escorted or unescorted. Beattie claims that prior to February 1989 he had escorted access clearance and had entered the secured area on at least seven occasions to perform work-related duties. *Id.* at 180–91; Brief of Appellant at 5–6.[3] Boeing contends that "the credible uncontroverted evidence is that plaintiff did not have such access clearance and that plaintiff was never on the escorted access list." Brief of Appellee at 7.[4]

---

1. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2. While the court also granted summary judgment on Beattie's claim for interference with prospective economic advantage under Kansas law, Beattie does not appeal this part of the court's ruling.

3. The testimony of two other Boeing employees corroborates Beattie's claim that he previously had access to the Air Force One area. A Boeing security guard testified that he had escorted Beattie into the restricted area on several occasions in order for Beattie to issue permits for cutting or welding on the aircraft. App. at 283–84, 286. Another Boeing employee testified that he had seen Beattie in the Air Force One area between one and five times before Beattie's name was removed from the entry control list, the list of persons allowed to enter the area, by order of Boeing's security administrator. *Id.* at 320–21.

4. The district court apparently adopted Boeing's characterization of the evidence. In its Memorandum and Order granting summary judgment, the court stated that "[a]lthough Beattie had a general Boeing security clearance, he had not received Air Force One access clearance." Brief of Appellant, App. at 4.

On February 11, 1989, Beattie requested access to the Air Force One area in order to check certain fire valves, but his request was denied by the Air Force guard on duty. App. at 188, 255. Two days later, Beattie asked the fire chief, Roger Xanders, what the reason was for the denial. Xanders told him that Boeing's Security Administrator, James Barton, had decided to take Beattie off the Air Force One project because of his previous off-duty political activities, including certain anti-nuclear activities. *Id.* at 188–89, 191, 232–33, 254.[5] Xanders further indicated that he had included Beattie on a list of employees for whom Xanders was seeking "optimum Presidential security clearance" but that Barton had ordered Beattie's name taken off that list because of his political activities. *Id.* at 188–191, 232–33, 255.[6]

According to Beattie, Barton told him that he had been taken off the Air Force One project and the list of potential candidates for "optimum Presidential security clearance" because his prior anti-nuclear activities called into question his loyalty to the United States and, hence, his eligibility for access clearance under the Air Force contract. *Id.* at 115, 191, 255–56, 264; *see also id.* at 232–33.[7] Barton's decision to remove Beattie from the list of candidates for access clearance was neither reviewed nor confirmed by his superiors at Boeing or by the Air Force. *Id.* at 205, 210–12.

On March 3, 1989, Beattie wrote a memorandum to Xanders requesting that his name be submitted "for the Air Force clearance,

described to me by Mr. Barton as 'optimum Presidential security clearance.'" Appellee's Supp.App. (Supp.App.) at 91, which Beattie understood to mean escorted access clearance. App. at 114, 115. Xanders passed the request on to his superiors at Boeing, including Barton, Adolph Lomely, Jr. (Boeing's manager of program security), Natt J. Addleman (Boeing's manager for information security), and Kerry D. Crisp (Boeing's manager of security and fire protection). *Id.* at 213–14, 218; Supp.App. at 218.

In the course of an initial investigation of Beattie's background and suitability for access clearance, Barton provided Lomely with information about some of Beattie's "anti-nuclear activities," and Lomely passed the information on to Addleman. App. at 214, 334. Based on this information and a Boeing Defense Investigative Service report detailing two previously undisclosed contacts between Beattie and citizens of the Soviet Union,[8] the Boeing managers concluded that Beattie's request for escorted access should be referred to the Air Force. *Id.* at 214–18, 221–22, 288–91.

Accordingly on May 10, 1989, Crisp sent a letter to the appropriate Air Force representative requesting that the Air Force decide whether Beattie's request should be approved because "unique circumstances" precluded Boeing from making a "fair and just determination." Supp.App. at 81.

The special circumstances referred to . . . concern a report to the Defense Industrial

---

**5.** Beattie summarizes his past political activities as follows:

> My political activities have consisted of writing letters to the editor and to the members of Congress, making speeches, running for the Legislature in 1988, organizing a political organization for Dukakis, organizing a group of firefighters to work for prevention of nuclear war and other mainstream activities. I have spoken out on the issues related to nuclear policies.

App. at 116.

**6.** In his deposition, Xanders testified that he submitted Beattie's name to Barton for approval for escorted access clearance. App. at 232. Xanders further testified that Barton instructed him to remove Beattie's name from the list because of his off-duty political activities. *Id.* at 232–235.

**7.** In his deposition, Barton denied that he intended to question Beattie's loyalty to the United States. Appellee's Supp.App. at 42.

**8.** The report dated March 24, 1989, noted two contacts between Beattie and Soviet citizens. App. at 317. In April 1986, Beattie reportedly contacted the Soviet Embassy in Washington, D.C., to express his sympathy in connection with the death of Chernobyl firefighters. *Id.* And in March 1987, Beattie reportedly spoke with a Soviet doctor at a conference in Chicago, Illinois, about remarks made by a certain senator. *Id.* Under the Boeing Security Manual for Safeguarding Classified Information § 2.1(J), the foregoing contacts should have been reported in advance to Boeing's Security Administration, but Beattie did not report the incidents until March 24, 1989. Supp.App. at 33, 158.

Security Clearance Office.... This report was prompted by our learning of Mr. Beattie's making contact with representatives from designated countries and failing to report that contact. The findings of any investigation resulting from this report could influence an access decision. We are not, however, privy to this information and therefore are unable to make an informed determination in this case.

*Id.*

In July 1989 the Air Force determined that "[b]ased on Mr. Beattie's past history, he is not authorized escorted or unescorted access to the [Air Force One] security area."[9] Supp.App. at 82. Beattie remained at Boeing until June 1990 when he resigned his employment as a firefighter to attend law school. *Id.* at 7; Brief of Appellee at 15.

Beattie filed the instant suit against Boeing in 1991 alleging that his loss of access clearance had damaged his reputation, caused him to lose promotional opportunities, and led to harassment on the job which resulted in mental distress. App. at 7–8.[10] Following extensive discovery, Boeing filed a motion for summary judgment, arguing that (1) no *Bivens* action can be maintained against a private corporation such as Boeing, and (2) even if a *Bivens* action could in theory be asserted against Boeing, Beattie's claim against the company fails because Boeing was not engaged in federal action. App. at 65(*l*) and 65(*o*).

In granting summary judgment, the district court did not decide whether a *Bivens* claim can be asserted against a nongovernmental entity such as Boeing. Instead, the court based its ruling on its finding that Boeing had not engaged in governmental action in connection with the refusal to grant Beattie access to the Air Force One area.

Specifically, the court concluded that Boeing had not "engaged in joint activity with the Air Force" because the company "made no recommendation as to whether [Beattie's access] request should be allowed or denied"; rather, "[i]t was the Air Force which denied Beattie's request for clearance." *Id.* at 59–60 (citing and distinguishing *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1430 (10th Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 65, 88 L.Ed.2d 53 (1985), and *cert. granted, decision vacated and remanded for reconsideration by City of Lawton v. Lusby*, 474 U.S. 805, 106 S.Ct. 40, 88 L.Ed.2d 33 (1985) (mem.), *reaff'd on reconsideration*, 796 F.2d 1307 (10th Cir.), *cert. denied*, 479 U.S. 884, 107 S.Ct. 275, 93 L.Ed.2d 251 (1986)).

The court concluded that Boeing's affairs were not "so intertwined with those of the government that it may be said to have acted on behalf of the government," and the government "did not 'delegate' decision-making responsibility for security to Boeing" so as to permit Boeing to exercise powers traditionally reserved exclusively to the government. App. at 59–60. Instead, the court found that the Air Force merely allowed Boeing to "take action with regard to limited security clearance," subject to Air Force override, and held that Boeing's activities did not amount to governmental action subject to constitutional scrutiny and potential *Bivens* liability. *Id.* at 60–61.

## II

### The Availability of a *Bivens* Remedy

The threshold question in this appeal is whether we should recognize a *Bivens* action in this case. If we cannot recognize a *Bivens* action under these facts, then the district court's grant of summary judgment in favor of Boeing must be affirmed.

---

**9.** In the same letter, the Air Force expressed concern that Boeing "didn't disqualify Mr. Beattie based on the report made to the Defense Investigative Service." Supp.App. at 33, 158.

**10.** Beattie previously brought a civil rights suit against the United States, seeking declaratory and injunctive relief premised on the same adverse action concerning access to the Air Force One area which is alleged in the instant case. Summary judgment was granted for the government due to lack of jurisdiction to review the security decision and lack of merit to the constitutional claims asserted. *Beattie v. United States,* 759 F.Supp. 753 (D.Kan.1991). We dismissed the appeal of that judgment because the cause had become moot due to Beattie's unilateral termination of his employment with Boeing, and we remanded the case to the district court with directions to vacate its judgment and dismiss the action for want of jurisdiction. *Beattie v. United States,* 949 F.2d 1092, 1095 (10th Cir.1991).

■ For reasons given below, we are convinced that there are "special factors counselling hesitation" before recognizing a *Bivens* action in these circumstances. *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 403 U.S. 388, 396, 91 S.Ct. 1999, 2004, 29 L.Ed.2d 619 (1971). While defendant Boeing does not frame its appellate propositions and arguments in these terms, its brief before us does refer to the "special factors" analysis which we feel requires our holding that we should not recognize a *Bivens* claim here.[11] In any event, we are obliged to make this analysis because "[b]efore a *Bivens* remedy may be fashioned ... a court *must* take into account any 'special factors counselling hesitation.'" *Chappell v. Wallace,* 462 U.S. 296, 298, 103 S.Ct. 2362, 2365, 76 L.Ed.2d 586 (1983) (emphasis added); *see also Bush v. Lucas,* 462 U.S. 367, 378, 103 S.Ct. 2404, 2411, 76 L.Ed.2d 648 (1983) (federal courts must, in making a remedial determination appropriate for a common-law tribunal, pay "particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation"). Here we find that the predominant issue of national security clearances amounts to such a special factor counselling against recognition of a *Bivens* claim in this case.

In *Bivens,* the Supreme Court recognized that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct." 403 U.S. at 389, 91 S.Ct. at 2001. The Court noted that Congress had not specifically provided for a damages remedy for Fourth Amendment violations by federal agents and that "the Fourth Amendment does not in so many words provide for its enforcement by an award of monetary damages for the consequences of its violation." *Id.* at 396, 91 S.Ct. at 2004. The Court noted, however, that "[t]he present case involves no special factors counselling hesitation in the absence of affirmative action by Congress," *id.,* and therefore held that Bivens could maintain an action for damages against the federal agents who allegedly violated his Fourth Amendment rights.

■ *Bivens* actions have also been recognized for violations of the equal protection component of the Fifth Amendment Due Process Clause, *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and the Eighth Amendment Cruel and Unusual Punishment Clause, *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980).[12] "In each of these cases, as in *Bi-*

11. In its brief before us, Boeing mentioned the "special factors" analysis while addressing its argument that Boeing did not act under color of federal law or engage in federal action:

In [*Stevens v. Morrison–Knudsen Saudi Arabia Consortium,* 576 F.Supp. 516 (D.Md.1983), *aff'd,* 755 F.2d 375 (4th Cir.1985)], the defendant was a private corporate employer under a substantial construction contract with the United States Army Corps of Engineers. The court in *Stevens* first noted that a *Bivens* cause of action is narrow and that the United States Supreme Court has cautioned that even where a *Bivens* claim might otherwise lie, the remedy may be unavailable where "special factors counseling [sic] hesitation" exist. 576 F.Supp. at 520, quoting *Bivens,* 403 U.S. at 396 [91 S.Ct. at 2004].

Brief of Appellee at 22.

Moreover, Beattie treated the special factors analysis, although briefly, in his Reply Brief of Appellant at 12, stating: "There are no special considerations which should block applicability of *Bivens* and hence the *First Amendment* to this case. This Court should recognize the viability of Bivens-style actions against private corporations who act under color of federal law." Fur-

ther Beattie argued that defendant Boeing omitted from its discussion of *Gerena v. Puerto Rico Legal Serv., Inc.,* 697 F.2d 447 (1st Cir.1983), the fact that the decision "did not deem defendant's private status as a special factor counselling hesitation." *Id.* at 11. Thus, the "special factors" analysis was mentioned, although briefly, by the parties.

12. The Supreme Court has declined to recognize *Bivens* actions involving alleged First Amendment violations in some circumstances. *See, e.g., Bush v. Lucas,* 462 U.S. 367, 368, 103 S.Ct. 2404, 2406, 76 L.Ed.2d 648 (1983) (refusing to allow *Bivens* action for violations of federal employee's First Amendment rights by his superiors because the employment relationship was "governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States."). However, whether a *Bivens* action exists must be decided on a case by case basis, including consideration of whether special factors may counsel hesitation in recognizing such a claim.

We note that we have previously recognized *Bivens* actions for violations of the First Amend-

*vens* itself, the Court found that there were no 'special factors counselling hesitation in the absence of affirmative action by Congress,' no explicit statutory prohibition against the relief sought, and no exclusive statutory alternative remedy." *Schweiker v. Chilicky,* 487 U.S. 412, 421, 108 S.Ct. 2460, 2466, 101 L.Ed.2d 370 (1988). In *Chilicky* the Court stated:

> In sum, the concept of "special factors counselling hesitation in the absence of affirmative action by Congress" has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent. When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies.

*Id.* at 423, 108 S.Ct. at 2467.

In more recent decisions, the Court has "responded cautiously to suggestions that *Bivens* remedies be extended into new contexts. The absence of statutory relief for a constitutional violation, for example, does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation." *Chilicky,* 487 U.S. 412, 421–22, 108 S.Ct. 2460, 2466–67. In each case, the Court has examined whether there is an alternative remedy or whether, even in the absence of an alternative remedy, "special factors" preclude a *Bivens* action.

In *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), the Court unanimously refused "to create a *Bivens* action for enlisted military personnel who alleged that they had been injured by the unconstitutional actions of their superior officers," *Chilicky,* 487 U.S. at 422, 108 S.Ct. at 2467, despite the fact that the personnel had no remedy against the government. The Court noted that "the unique disciplinary structure of the Military Establishment and Congress' activity in the field constitute 'special factors' which dictate that it would be inappropriate to provide enlisted military personnel a *Bivens*-type remedy against their superior officers." *Chappell,* 462 U.S. at 304, 103 S.Ct. at 2367.

In *United States v. Stanley,* 483 U.S. 669, 681, 107 S.Ct. 3054, 3062, 97 L.Ed.2d 550 (1987), the Court stated the general proposition that *Bivens* actions should never be allowed for military personnel where the alleged "injury arises out of activity 'incident to service.'"[13] The "special factor" counselling hesitation was "the fact that congressionally uninvited intrusion into military affairs by the judiciary is inappropriate." *Id.* at 683, 107 S.Ct. at 3063. Thus, "no *Bivens* remedy is available for injuries that 'arise out of or are in the course of activity incident to service.'" *Id.* at 684, 107 S.Ct. at 3064 (citation omitted).

The Supreme Court has not specifically addressed whether the denial of a security clearance can be grounds for a *Bivens* action. However, in *Dep't of Navy v. Egan,* 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), the Court considered "whether the Merit Systems Protection Board (Board) has authority to review the substance of an underlying decision to revoke a security clearance in the course of reviewing an adverse action." *Id.* at 520, 108 S.Ct. at 820. In concluding that it did not, the Court noted that "the grant of security clearance to a particular employee, a

---

ment where federal employees infringe on rights of association and expression. *See Nat'l Commodity and Barter Ass'n v. Gibbs,* 886 F.2d 1240, 1248 (10th Cir.1989) (per curiam); *Nat'l Commodity and Barter Ass'n v. Archer,* 31 F.3d 1521, 1529–31 (10th Cir.1994); *accord Dellums v. Powell,* 566 F.2d 167, 195–96 (D.C.Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *Gibson v. United States,* 781 F.2d 1334, 1342 (9th Cir.1986), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987).

**13.** *Stanley* arose out of the Army's program of secret testing of the drug lysergic acid diethyla-

mide (LSD). Stanley was a master sergeant at Fort Knox who had volunteered in 1958 to participate in a program ostensibly designed to test the effectiveness of protective clothing and equipment as defenses against chemical warfare. Instead, he was secretly administered doses of LSD four times in a month. He suffered hallucinations, periods of incoherence and memory loss, among other adverse effects. It was not until late 1975 that he learned he had been given LSD. *See Stanley,* 483 U.S. at 671–72, 107 S.Ct. at 3057–58.

sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch." *Id.* at 527, 108 S.Ct. at 824. The Court emphasized:

The President, after all, is the 'Commander in Chief of the Army and Navy of the United States.' U.S. Const., Art. II, § 2. His authority to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant.

. . . .

It should be obvious that no one has a "right" to a security clearance. The grant of a clearance requires an affirmative act of discretion on the part of the granting official. The general standard is that a clearance may be granted only when "clearly consistent with the interest of the national security." [citations omitted].

Predictive judgments of this kind must be made by those with the necessary expertise in protecting classified information. For "reasons ... too obvious to call for enlarged discussion," [citation omitted], the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it. Certainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary prediction with confidence. Nor can such a body determine what constitutes an acceptable margin of error in assessing potential risk.... Thus, unless Congress has specifically provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs. [citations omitted].

*Id.* at 527–30, 108 S.Ct. at 824–25.

■ *Egan* thus stands for the proposition that decisions regarding the grant or denial of a security clearance are the province of the Executive Branch. Although *Egan* addressed only the authority of the Merit Systems Protection Board to review such decisions, we believe that the reasoning extends to review by the courts. *See Hill v. Dep't of Air Force,* 844 F.2d 1407, 1411–13 (10th Cir.), *cert. denied,* 488 U.S. 825, 109 S.Ct. 73, 102 L.Ed.2d 49 (1988). Like the Board, we are an "outside nonexpert body" unqualified to second-guess the judgment of the President, acting through his officials in the Executive Branch, on whether to grant or deny a security clearance. As we said in *Hill:*

The Executive Branch has constitutional responsibility to classify and control access to information bearing on national security. A security clearance is merely temporary permission by the Executive for access to national secrets. It flows from a discretionary exercise of judgment by the Executive as to the suitability of the recipient for such access, consistent with the interests of national security.

*Id.*

In *Hill,* the district judge had granted a preliminary injunction requiring the Air Force to reinstate the plaintiff's security clearance. 844 F.2d at 1408. The district judge found that the Air Force's action in suspending the plaintiff's clearance had deprived plaintiff of his Fifth Amendment rights to equal protection and due process. On appeal, we applied the rationale of *Egan* and held that the district court had no authority to review the Air Force's suspension of Hill's security clearance:

[*Egan* ] removes any doubt regarding the authority of federal courts to review the merits of the grant or denial of security clearances. Under any circumstance which might be germane to this case there is no such authority. As is indicated by the Supreme Court's statement of the question in that case, *Egan* extends to the merits of suspension, modification or revocation of a previously granted security clearance, since the underlying rationale applies with equal logic to revocation as it does to an initial grant of authority. These matters are a "sensitive and inher-

ently discretionary judgment call ... committed by law to the appropriate agency of the Executive Branch."

*Id.* at 1409 (citation omitted). *See also Dorfmont v. Brown,* 913 F.2d 1399, 1401 (9th Cir.1990) ("[w]e have no more business reviewing the merits of a decision to grant or revoke a security clearance than does the [Merit Systems Protection Board]. Thus, the reasoning behind *Egan* precludes this type of judicial review."), *cert. denied,* 499 U.S. 905, 111 S.Ct. 1104, 113 L.Ed.2d 214 (1991). We believe the reasoning of *Egan* and *Hill* applies to this case as well.

█ In a prior lawsuit arising out of the same underlying facts, Beattie sued the United States alleging, as he has here, that denying him access to the Air Force One area violated his constitutional rights. *Beattie v. United States,* 759 F.Supp. 753 (D.Kan.1991) (*Beattie I*), *vacated as moot,* 949 F.2d 1092 (10th Cir.1991). The district court in *Beattie I* granted the government's motion for summary judgment, stating:

> The decision whether to allow access to the Air Force One area is the same type and quality and requires the same predictive judgment as the decision whether to grant a security clearance. The only distinction appears to be one of degree. An employee with secret security clearance is not necessarily allowed escorted or unescorted access to the Air Force One area. *This court concludes it cannot judicially review the merits of the Air Force's decision to deny the plaintiff access to this secured area. This court is in no position to second-guess that decision.*

759 F.Supp. at 759 (emphasis added) (citation omitted). Addressing Beattie's claim that his First Amendment right to free speech was violated, the court concluded:

> this court is not willing to compromise national security and substitute its decision for that of the Air Force on what is a

security risk. To deny access on the basis of plaintiff's contacts with Soviet citizens is not so unreasonable or untenable as to justify a closer scrutiny, or judicial investigation of sorts, into the Air Force's reasoning.

*Id.* at 762. We agree with this sound reasoning and decide the current lawsuit on the same grounds.

To be sure, the case before us involves a private party rather than a government agency. However, Boeing's limited authority to grant or deny escorted access clearance derived solely from its contract with the Air Force. App. at 137–41, 205–07, 222–23, 226.[14] Boeing's authority was thus delegated to it by the Air Force, and hence by the Executive Branch. We see no compelling reason to treat the security clearance decision by Boeing differently than the similar decision made by the Air Force. Both decisions represent the exercise of authority delegated by the Executive Branch and are entitled to appropriate deference by the federal courts. *See Beattie I,* 759 F.Supp. at 759. Therefore, we conclude that we may not review Boeing's action or that of the Air Force in denying Beattie access to the Air Force One area.[15]

█ Beattie alleges that the denial of access violated his First Amendment rights. To consider this claim would necessarily require us to review the merits of the decisions to deny access to the Air Force One area. This we cannot do. The unreviewability of the security clearance decision is a "special factor counselling hesitation," which precludes our recognizing a *Bivens* claim in this case.

**AFFIRMED.**

---

**14.** According to deposition testimony, in making decisions regarding security clearance Boeing was required to apply the standards set forth in the contract, including ascertaining whether an applicant possessed "unquestioned loyalty to the United States." App. at 137–41, 205–07, 222–23, 226; Supp.App. at 118.

**15.** At this time, we need not resolve whether such denials are unreviewable under all circumstances. *See Jamil v. Sec'y, Dep't of Defense,* 910 F.2d 1203, 1207 (4th Cir.1990) ("we need not and do not reach the question of whether *Egan* precludes courts from reviewing security clearance decisions for pretext in the context of ... a Title VII claim of discrimination.").