# United States Court of Appeals
# for the Fifth Circuit

———————

No. 21-11060

———————

United States Court of Appeals
Fifth Circuit

**FILED**

February 15, 2024

Lyle W. Cayce
Clerk

United States of America, *ex rel*; Dana Johnson, *Relator*,

*Plaintiff—Appellant*,

*versus*

Raytheon Company,

*Defendant—Appellee*.

———————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:17-CV-1098

———————————————————————

Before Stewart, Dennis, and Higginson, *Circuit Judges*.
James L. Dennis, *Circuit Judge*:

Plaintiff-Appellant Dana Johnson sued his former employer Defendant-Appellee Raytheon Co. under the False Claims Act, claiming retaliation for reporting fraudulent misrepresentations that Raytheon allegedly made to the Navy. The district court held it lacked subject-matter jurisdiction over all but one of Johnson's claims and granted summary judgment to Raytheon on the remaining claim. We conclude that the district court correctly held *Department of the Navy v. Egan*, 484 U.S. 518 (1988), bars review of Johnson's claims implicating the merits of the decision to revoke his security clearance and that Johnson failed to present a prima facie case of

retaliation for the remaining claim we have jurisdiction to assess. Accordingly, we AFFIRM.

## I. BACKGROUND

### A. Facts

Defendant-Appellee Raytheon Co. is a government defense contractor. The U.S. Navy is one of Raytheon's customers. One of Raytheon's Navy projects is the Advanced Sensor Technology (AST) Program. The AST Program is a "Special Access Program," meaning Raytheon employees must have top-secret security clearance and be deemed mission critical to work on the Program. The federal government has full discretion to grant Raytheon employees security clearances and access to the Program. Raytheon's contract with the Navy includes security requirements, and Raytheon has security plans that are approved by the Navy. As part of its security plan, Raytheon monitors its employees' activities, including their computer and network use. Raytheon is required to report security concerns to the Navy.

Plaintiff-Appellant Dana Johnson worked for Raytheon for thirty years, most recently as a systems engineer on the AST Program. Johnson claims that he saw Raytheon make fraudulent misrepresentation to the Navy about the products and equipment that Raytheon was providing through the AST Program, and that he spoke up internally about the problems over a couple of years with a number of supervisors and managers, though he never utilized official channels either with Raytheon or the Navy to express his fraud concerns. Johnson claims he identified and spoke out about four different problems that arose during his employment.

First, Johnson encountered a problem with a "radar mode" in the Navy's planes, and Johnson informed manager Brian Cook. According to Johnson, he fixed the problem in the computer code, but Raytheon did not

follow through with the necessary recalibration of the radar because it would have been expensive and time-consuming. Cook told Johnson to sign off on the project anyway. Johnson refused because that would have meant making a false representation to the Navy. Raytheon nevertheless told the Navy that there was no issue.

The second problem involved a faulty computer initialization or "booting" process caused by outdated software that would make radar programs crash. Johnson recommended using updated software to fix the problem, but no software upgrade occurred. Later, Johnson was told that Raytheon had informed the Navy that the problem was fixed, but Johnson knew this was false. He reported this issue to supervisors Mike Leddy and Steve Blazo, as well as to a test conductor named Rick Scoggins, among others. Sometime in 2013 or 2014, a member of the Raytheon security department, Mack Slater, twice told Johnson to stop talking to the Navy about problems.

The third problem involved equipment called oscilloscopes. According to Johnson, he discovered that the equipment was damaged and that Raytheon was hiding it from the Navy. He reported the issue to a manager and his supervisor and told them that hiding the status of the equipment was a violation of Raytheon's contract with the Navy.

The fourth problem involved the creation of a configuration guide for laptops. Johnson and other software engineers wrote a guide for use by the Navy and submitted it to Raytheon for approval. The guide was approved, but the final version did not include items that the software engineers deemed essential. Johnson told supervisor Rocky Carpenter about this problem. Johnson said that omission of certain information would lead to testing problems, but Raytheon told the Navy that the guide was approved by the engineers anyway.

No. 21-11060

According to Johnson, after he reported these concerns to managers and supervisors, Raytheon began to subject him to increased monitoring and allegedly fabricated a record of misconduct against him. According to Raytheon, computer auditing that it conducts as part of its contract with the Navy showed Johnson was taking unauthorized actions. Eventually, in January 2015, Raytheon's AST Program Security Officer, Lynne Sharp, reported Johnson to the Navy for suspected security violations. Raytheon claims the reporting was required by its Navy contract. Johnson claims this was an act of retaliation.

The Navy and the Naval Criminal Investigative Service (NCIS) began an investigation. They conducted forensic audits and eventually interviewed Johnson. Johnson states he did not initially realize that he was the target of an investigation, but instead believed that the Navy was investigating his concerns about Raytheon. Partway through the investigation, the Navy suspended Johnson's AST Program access on an interim basis after a co-worker told him he was the target. At the end of the investigation, in July 2015, the Navy found that Johnson had committed security violations and subsequently permanently revoked his access to the AST Program. Specifically, the Navy found that Johnson (1) downloaded and used an unauthorized software program called Wireshark (referred to as a "sniffer" or "analysis software") on a protected network and ran network scans more than 100 times, and (2) used a computer at Raytheon that was designated for Boeing work (not Navy work) without permission, and, in doing so, accessed information without authorization. The Navy instructed Sharp to inform the Department of Defense Central Adjudication Facility (DOD CAF)—the agency that manages security clearances relevant to this case—of the Navy's finding that Johnson committed security violations, and she states she did so. According to the NCIS, in September 2015, the DOD CAF revoked Johnson's top-secret security clearance.

No. 21-11060

After the Navy completed its investigation, Raytheon conducted its own disciplinary investigation based on the Navy's findings and terminated Johnson's employment. Sarah Humphrey, a member of Raytheon's Human Resources (HR) department, conducted the investigation, interviewed other employees, and provided a report to HR and Security Vice President Gary LaMonte. LaMonte made the final decision to terminate Johnson in October 2015. Johnson claims he was not provided with the findings of the investigations, told of the violations, or allowed to respond to the findings prior to being fired. While Johnson was interviewed as part of both investigations, he states that he was merely asked hypothetical questions and not given a chance to respond to anything specific. At the time of his termination, Johnson says he was qualified to work on other projects at Raytheon that did not require a security clearance but was fired after thirty years with the company instead of being transferred to another project.

## B. Procedural History

Johnson filed a complaint in the United States District Court for the Northern District of Texas, which included both a *qui tam* action on behalf of the United States and a retaliation claim on his own behalf, both pursuant to the False Claims Act, 31 U.S.C. §§ 3729–33. The United States declined to intervene and moved to dismiss the *qui tam* claims. The district court granted the United States' motion and granted Johnson leave to amend his complaint to replead his retaliation claim. In his second amended complaint, Johnson claimed that he engaged in protected activity when he identified and spoke out about concealing issues from the Navy, and Raytheon retaliated against him in four different ways: (1) Raytheon, through Slater, instructed him not to report problems to the Navy; (2) Raytheon monitored him; (3) Raytheon made false accusations about him to the Navy; and (4) Raytheon fired him.

5

No. 21-11060

During the discovery process, the parties had difficulty with requests for production that involved allegedly classified documents or documents stored in classified computer systems that required Navy review. Discovery issues eventually resulted in an agreed-to order that established a process for Raytheon to file a motion to dismiss/motion for summary judgment:

- Raytheon would first file a "summary of the basis" for its motion to enable the parties to narrow the scope of discovery to what was needed to support and oppose the motion.

- Next, the parties would conduct discovery for approximately two months.

- Two weeks after discovery was completed, Raytheon would file its motion to dismiss/motion for summary judgment.

- Then, Johnson would have the choice of either responding to the motion or filing a Federal Rule of Civil Procedure 56(d) declaration identifying what additional discovery was needed to respond.

- Finally, after any Rule 56(d) issue was resolved, Johnson would respond to the motion and Raytheon would reply.

Raytheon timely submitted its summary, and then, after conducting discovery, timely filed a combined motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) and motion for summary judgment under Federal Rule of Civil Procedure 56, arguing, in relevant part, that the district court lacked subject-matter jurisdiction over most of Johnson's claims pursuant to *Department of the Navy v. Egan*, 484 U.S. 518 (1988), and its progeny, and, on the merits, the only act of alleged retaliation that the district court had subject-matter jurisdiction to consider—instructing Johnson not to report problems to the Navy—was not a materially adverse employment action. In response, Johnson filed a Rule 56(d) declaration requesting additional discovery. The district court denied Johnson's request for additional discovery and ordered Johnson to respond to Raytheon's motion, but allowed Johnson to file a supplemental Rule 56(d) declaration with his summary

judgment opposition. Johnson filed an opposition, with exhibits. With his opposition brief, Johnson also renewed his initial Rule 56(d) declaration and made a supplemental declaration. Raytheon filed a reply. After oral argument, the district court granted Raytheon's Rule 12(b)(1) motion and dismissed Johnson's retaliation claim in part for lack of subject-matter jurisdiction and granted summary judgment in part on the merits in favor of Raytheon. The district court also denied Johnson's renewed Rule 56(d) request for additional discovery. Johnson timely appealed.

## II. LEGAL STANDARDS

The district court's grant of Raytheon's Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction and its Rule 56 motion for summary judgment are both reviewed *de novo*, applying the same standards as the district court. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 328 (5th Cir. 2017).

Subject-matter jurisdiction may be assessed on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming*, 281 F.3d at 161. "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Id.* Under the second basis, which is applicable here, "our review is limited to determining whether the district court's application of the law is correct and, if the decision was based on undisputed facts, whether those facts are indeed undisputed." *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996) (first citing *Ynclan v. Dep't of the Air Force*, 943 F.2d 1388, 1390 (5th Cir.1991); and then citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." FED. R. CIV. P. 56(a). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020) (citing *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018)). "On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Deville v. Marcantel*, 567 F.3d 156, 163–64 (5th Cir. 2009).

The denial of a Rule 56(d) request is reviewed for abuse of discretion. *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 417 (5th Cir. 2016). The standard for abuse of discretion is generally "whether the evidence requested would affect the outcome of a summary judgment motion." *Id.* at 423. "This court has found an abuse of discretion where it can identify a specific piece of evidence that would likely create a material fact issue." *Id.* "In contrast, this court has found no abuse of discretion where the party filing the Rule 56(d) motion has failed to identify sufficiently specific or material evidence to affect a summary judgment ruling." *Id.*

## III. ANALYSIS

The False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, is the government's primary litigation tool for the recovery of losses sustained as the result of fraud against the government. *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 (5th Cir. 2010) (citing *United States ex rel. Marcy v. Rowan Cos.*, 520 F.3d 384, 388 (5th Cir. 2008)); *see also* 5B JOHN BOURDEAU, ET AL., FEDERAL PROCEDURE, LAWYERS EDITION § 10:49, Westlaw (database updated Nov. 2023). The FCA provides for civil penalties and multiple damages for knowingly presenting false or fraudulent claims to the government, and authorizes civil actions to remedy such fraud, which may be brought by the Attorney General or by private individuals in the government's name. 5B BOURDEAU, ET AL.,

No. 21-11060

*supra* § 10:49. To protect internal "whistleblowers," the FCA also includes an anti-retaliation provision:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1). "The purpose of the False Claims Act, of course, is to discourage fraud against the government, and the whistleblower provision is intended to encourage those with knowledge of fraud to come forward." *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994). Relief available to whistleblowers who incurred retaliation includes reinstatement, double back pay with interest, and special damages, including costs and attorneys' fees. 31 U.S.C. § 3730(h)(2).

FCA retaliation claims involving circumstantial evidence are analyzed using the familiar *McDonnell Douglas* burden-shifting framework.[1] *See, e.g.*, *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 561 (5th Cir. 2019); *Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 175 (5th Cir. 2016); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973) (establishing this

---

[1] Johnson also briefly argues that he presented direct evidence of retaliation, which is evaluated outside of the *McDonnell Douglas* framework. *Cf. Septimus v. Univ. of Hous.*, 399 F.3d 601, 608 (5th Cir. 2005) (stating in the Title VII context that *McDonnell Douglas* does not apply to cases which there is direct evidence of retaliation). "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993) (citing *Burns v. Gadsden State Cmty. Coll.*, 908 F.2d 1512 (11th Cir. 1990)). That is not the case with any of the evidence offered by Johnson. Accordingly, we apply the *McDonnell Douglas* framework.

framework). "Under this framework, the employee must first establish a prima facie case of retaliation by showing: (1) that he engaged in protected activity; (2) that the employer knew about the protected activity; and (3) retaliation because of the protected activity." *Musser*, 944 F.3d at 561. "If the employee establishes a prima facie case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision." *Musser*, 944 F.3d at 561 (quoting *Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 241 (5th Cir. 2019)). "'This burden is one of production, not persuasion,' and it involves no credibility assessment." *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). "After the employer articulates a legitimate reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation." *Id.* (quotation omitted). To prevail on an FCA retaliation claim, the plaintiff must ultimately prove at trial that the retaliatory motive was a but-for cause of the adverse employment action. *Id.*

Johnson brings four claims of retaliation: (1) a retaliation claim based on Slater advising him not to report problems to the Navy; (2) a retaliation claim based on Raytheon monitoring him; (3) a retaliation claim based on Raytheon reporting false accusations of security violations to the Navy; and (4) a retaliation claim based on Raytheon firing him. However, before we examine the merits of these claims, we must first assure ourselves of our jurisdiction. *See Cleartrac, L.L.C. v. Lanrick Contractors, L.L.C.*, 53 F.4th 361, 364 (5th Cir. 2022).

## A. Subject-Matter Jurisdiction Under *Egan*

Jurisdiction over three of Johnson's four FCA retaliation claims is complicated by the presence of sensitive national security issues. Raytheon's proffered legitimate, non-retaliatory reason for monitoring Johnson (claim two), reporting his conduct to the Navy (claim three), and ultimately firing

him (claim four)—the second step of the *McDonnell Douglas* framework—is that the Navy found Johnson had committed several serious security violations, which caused the Navy to revoke his access to the AST Program and the DOD CAF to revoke his top-secret security clearance. Raytheon argues that, even assuming arguendo that Johnson has made out a prima facie case of retaliation as to these three claims, assessment of these claims is largely barred by the Supreme Court's decision in *Department of the Navy v. Egan*, 484 U.S. 518 (1988), and its progeny because determining whether Raytheon's proffered legitimate, non-retaliatory reason is pretextual would necessarily require scrutinizing the DOD CAF's decision to revoke Johnson's security clearance, which credited the Navy's finding that Johnson committed security violations.[2] The district court agreed with Raytheon, ruling that it lacked subject-matter jurisdiction under *Egan* to determine whether Raytheon's proffered reasons for monitoring, reporting, and terminating Johnson were pretextual. We agree as well.[3]

In *Egan*, the Supreme Court held that the Merit System Protection Board (MSPB) lacked authority "to review the substance of an underlying decision to deny or revoke a security clearance in the course of reviewing an adverse action" taken against a federal employee. 484 U.S. at 520. The Court

---

[2] Raytheon does not offer a legitimate, non-retaliatory reason for Johnson's remaining claim of retaliation—that Raytheon retaliated against him when Slater advised him to not raise concerns with the Navy (claim one)—and accordingly does not argue that *Egan* bars review of this claim. Instead, Raytheon argues Johnson has not made out a prima facie case of retaliation on this claim, an argument we address below. As to *Egan*, though, we agree it is not implicated by this claim.

[3] Raytheon also argues that, as a government contractor, it is absolutely immune from claims regarding its monitoring and reporting under a purported doctrine of immunity that protects government contractors from claims based on their reporting of security issues to their government clients. The district court did not address Raytheon's "absolute immunity" claim, resolving the case in light of *Egan* instead. Because we do the same, we also decline to reach Raytheon's claim of absolute immunity.

reasoned that the presumption in favor of review "runs aground when it encounters concerns of national security, as in this case, where the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch." *Id.* at 527. *Egan* did not ultimately ground its holding in the text of the civil service law or any other statute, but instead held that it "flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant." *Id.* *Egan* also explained that security clearance decisions were not subject to review because of their unusually "predictive" nature in assessing a person's potential to compromise sensitive information and the decisions' grounding in specialized expertise that could not be reasonably reviewed by non-experts. *Id.* at 528–29. Courts, accordingly, should be "reluctant to intrude upon the authority of the Executive in military and national security affairs." *Id.* at 530.

Courts have not narrowly read *Egan* as merely applying to MSPB agency review of a security clearance revocation decision, but instead as embodying a broader principle that judicial review is not permitted over decisions that implicate the Executive's Article II powers "to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy." *Id.* at 527. We first adopted this understanding of *Egan* in *Perez v. F.B.I.*, 71 F.3d 513, 514–15 (5th Cir. 1995). *Perez* concerned a Title VII retaliation claim brought by a former FBI employee, who claimed that the FBI revoked his security clearance and fired him (as his job required a security clearance) because he had joined a class action lawsuit against the FBI alleging discrimination against Hispanic employees. *Id.* at 514. Under the applicable *McDonnell Douglas* framework, the FBI's proffered nondiscriminatory reasons for revoking the employee's security clearance and subsequently firing him were that he had "fabricated official reports" and "disclosed classified information to unauthorized

representatives of the Cuban Government." *Id.* We held that we lacked subject-matter jurisdiction under *Egan* to question these proffered reasons: "Because the court would have to examine the legitimacy and the possibly pretextual nature of the FBI's proffered reasons for revoking the employee's security clearance [under the *McDonnell Douglas* framework], any Title VII challenge to the revocation would of necessity require some judicial scrutiny of the merits of the revocation decision." *Id.* at 514. "As the Supreme Court and several circuit courts have held that such scrutiny is an impermissible intrusion by the Judicial Branch into the authority of the Executive Branch over matters of national security, neither we nor the district court have jurisdiction to consider those matters." *Id.* at 514–15. Raytheon argues that, because the present FCA case also requires use of the *McDonnell Douglas* framework, the same jurisdictional concerns raised in *Perez* are implicated when considering whether Raytheon's proffered legitimate, non-retaliatory reasons are pretextual.

However, before we turn to Johnson's pretext arguments, we must address two preliminary arguments he raises as to the applicability of *Egan* and *Perez*. The first argument is whether, as a factual matter, Johnson's top-secret security clearance was revoked, which the parties have argued over in briefing. *Egan* was specially concerned with reviewing the merits of a security clearance decision. 484 U.S. at 527–29. If Johnson's security clearance was not revoked, the question, then, is whether we may extend *Egan* to the revocation of Johnson's AST Program access.[4] However, because the

---

[4] Several circuits, including our own, have refused to extend *Egan* beyond security clearances to certain other government decisions. *See, e.g.*, *Toy v. Holder*, 714 F.3d 881, 885–86 (5th Cir. 2013); *Hale v. Johnson*, 845 F.3d 224, 229–31 (6th Cir. 2016); *Kukinski v. Mnuchin*, 829 F. App'x 78, 84–86 (6th Cir. 2020) (unpublished); *Rattigan v. Holder*, 689 F.3d 764, 767 (D.C. Cir. 2012). However, the D.C. and Federal Circuits have extended

undisputed facts show the DOD CAF revoked Johnson's top-secret security clearance based on the Navy's findings of security violations, we need not consider extending *Egan*. *See Barrera-Montenegro*, 74 F.3d at 659 (stating we must determine whether the undisputed facts forming the basis of a Rule 12(b)(1) dismissal are indeed undisputed). Raytheon has provided a report by the NCIS as well as affidavits by Raytheon personnel Sharp and LaMonte stating that the DOD CAF revoked Johnson's top-secret security clearance in September 2015 after Sharp informed the DOD CAF of the Navy's findings.[5] In response, the only evidence Johnson points to is his affidavit stating he has obtained a security clearance at his new job, without stating whether it was top-secret or a lower level of clearance. The fact that Johnson has obtained a new unspecified security clearance does not dispute the fact that his top-secret security clearance was previously revoked. Johnson's evidence fails to raise a dispute that his top-secret security clearance was revoked, and the mere statements to the contrary in his briefing, unsupported by the record, are insufficient to create a dispute of fact.

The second preliminary argument is that Raytheon is a private contractor, not a government actor, which raises the legal question of the extent to which *Egan* may apply in the private-employment context. The typical case running afoul of *Egan*'s jurisdictional concern is one against the government agency that made the security clearance decision.[6] However, the

_____

*Egan* to certain decisions analogous to a security clearance. *Foote v. Moniz*, 751 F.3d 656, 658 (D.C. Cir. 2014); *Kaplan v. Conyers*, 733 F.3d 1148, 1155–60 (Fed. Cir. 2023).

[5] Johnson forfeited any argument as to the competency of this evidence by failing to brief it on appeal. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021); *Jackson v. Gautreaux*, 3 F.4th 182, 188 n.* (5th Cir. 2021) (stating we cannot consider arguments raised for the first time at oral argument).

[6] Raytheon cites only one circuit case in which a suit against a private contractor was found to be barred by *Egan*, *Beattie v. Boeing Co.*, 43 F.3d 559, 566 (10th Cir. 1994). In that case, the Air Force delegated its authority to make security clearance decisions to a

Ninth Circuit had the opportunity to consider *Egan*'s applicability to private government contractors in *Zeinali v. Raytheon Co.*, 636 F.3d 544, 550-51 (9th Cir. 2011). The court held that, while "private employers can rarely avail themselves of *Egan*'s jurisdictional bar" because "[i]n employment discrimination suits against private employers, courts can generally avoid examining the merits of the government's security clearance decision," *Egan* nonetheless bars claims against private employers that "question the [government agency's] motivation behind the decision to deny [the plaintiff's] security clearance." *Id.* (third alteration in original) (quoting *Makky v. Chertoff*, 541 F.3d 205, 213 (3d Cir. 2008)). We find this reasoning persuasive. If a plaintiff's arguments question the merits of a government agency's security clearance decision, *Egan* and *Perez*'s concern over a court second-guessing the Executive Branch's exclusive discretion to control information bearing on national security is just as relevant in a case against a private employer as against the government itself. We conclude, therefore, that the mere fact Raytheon is a private contractor does not make *Egan*'s jurisdictional bar inapplicable; the key issue is whether the case requires the court to question the merits of, or motivation behind, the government's security clearance decision or whether the court may avoid such an inquiry by deciding only questions that do not necessarily require consideration of the merits of the security clearance decision. *See id.*; *Dubuque v. Boeing Co.*, 917 F.3d 666, 667 (8th Cir. 2019) (applying *Zeinali* in the private-employment context); *cf. Egan*, 484 U.S. at 526 (recognizing the MSPB could review certain related issues that did not implicate its concerns, such as "review of

--------

private contractor, and the court found "no compelling reason to treat the security clearance decision by [the private contractor] differently than the similar decision made by the Air Force," as "both decisions represent[ed] the exercise of authority delegated by the Executive Branch." *Id.* The present case does not exactly fit that mold.

the fact of denial, of the position's requirement of security clearance, and of the satisfactory provision of the requisite procedural protections").

Turning, then, to Johnson's pretext arguments, under *Perez*, we are bound to conclude that any analysis of the "possibly pretextual nature of [Raytheon]'s proffered reasons" for monitoring, reporting, and ultimately firing Johnson under the *McDonnell Douglas* framework "would of necessity require some judicial scrutiny of the merits of the [DOD CAF's security clearance] revocation decision." *See* 71 F.3d at 514. Raytheon's stated reason for firing Johnson is the Navy's determination that Johnson committed several serious security violations. Johnson argues this reason is pretextual because he has evidence that he did not commit any security violations. There is no way to assess whether Raytheon's reason was pretextual without treading on the DOD CAF's security clearance decision, which credited the Navy's investigation and finding that Johnson did commit security violations. The same is true for Raytheon's decisions to monitor him and report his suspected security violations to the Navy, even though these actions occurred *before* the Navy's investigation. "The reasons why a security investigation is initiated may very well be the same reasons why the final security clearance decision is made." *Becerra v. Dalton*, 94 F.3d 145, 148–49 (4th Cir. 1996) (holding the *instigation* of an investigation of a security clearance was covered by *Egan* because the investigation was closely tied to the security clearance decision). Johnson's claims regarding the monitoring and reporting by Raytheon are that they were based on false accusations of security violations. But the DOD CAF accepted the Navy's finding that these violations actually occurred, and there is no way to assess Raytheon's reason for monitoring and reporting Johnson without second-guessing that determination. *See Wilson v. Dep't of the Navy*, 843 F.3d 931, 935 (Fed. Cir. 2016) (declining to examine plaintiff's argument that the "initiation of revocation" of a security clearance was "based on 'false' complaints and

accusations" because the security investigation—which could not be second-guessed under *Egan*—"specifically found them reliable"); *Hill v. White*, 321 F.3d 1334, 1335–36 (11th Cir. 2003) ("To review the initial stages of a security clearance determination is to review the basis of the determination itself regardless of how the issue is characterized").

Johnson maintains that his pretext arguments do not require us to consider the merits of the DOD CAF's security clearance decision, relying primarily on two cases, but each is distinguishable from his case. Johnson first relies on the D.C. Circuit's decision in *Rattigan v. Holder*, 689 F.3d 764 (D.C. Cir. 2012). In *Rattigan*, the plaintiff was an FBI employee who alleged he was retaliated against when other employees reported false security concerns about him that resulted in an investigation. *Id.* at 764. Eventually, the security investigation concluded that the allegations "lacked corroboration and were unfounded," and the plaintiff retained his security clearance. *Id.* at 766. The plaintiff sued, arguing the decision to report false security concerns amounted to retaliation under Title VII. *Id.* at 766. The D.C. Circuit held that *Egan* did not apply because (1) the focus of the pretextual review under the *McDonnell Douglas* framework was on "decisions by other FBI employees who merely report security concerns," not "security clearance-related decisions made by trained Security Division personnel," and (2) the claim was "based on *knowingly false* reporting." *Id.* at 768, 770.

Urging us to adopt and apply the reasoning of *Rattigan*, Johnson argues *Egan* does not bar his claims because he is arguing that Raytheon monitored him under false pretenses; reported false security violations to the Navy; and after the Navy concluded its investigation, chose to fire Johnson, knowing the Navy's findings were based on false information. However, we need not decide whether to adopt *Rattigan*'s reasoning because Johnson's case falls outside of it. In *Rattigan*, judicial review was unlikely to interfere with national security because the security investigation concluded that the

allegations were unfounded. In Johnson's case, of course, the Navy's investigation, accepted by the DOD CAF, found that Johnson *had* committed the alleged security violations. Under the circumstances in this case, *Egan* precludes review of the false reporting claims because their resolution would necessarily implicate the merits of the DOD CAF's security clearance revocation. *See Bland v. Johnson*, 637 F. App'x 2, 2–3 (D.C. Cir. 2016) (unpublished), *aff'g for the reasons stated in* 66 F. Supp. 3d 69, 74–75 (D.D.C. 2014) ("In . . . contrast to *Rattigan*, in which the ultimate security decision was favorable to the plaintiff, *see* 689 F.3d at 766, here, DHS OSCO suspended Mr. Bland's clearance.").

Johnson also cites to the Ninth Circuit's decision in *Zeinali*. In that case, the plaintiff, who was of Iranian descent, claimed that he was discriminated against when he was fired by his employer, a private contractor, after the government denied him a security clearance, while similarly situated non-Iranian employees were retained. 636 F.3d at 546–47. The Ninth Circuit held *Egan* did not deprive the court of jurisdiction because the plaintiff did not argue the government "improperly denied his application for a security clearance," but instead "contend[ed] that [his employer's] security clearance requirement was not a bona fide job requirement, and that [his employer] used the government's security clearance decision as a pretext for terminating [him] in a discriminatory fashion." *Id.* at 551–52. To support his claim, the plaintiff introduced evidence that other similarly situated employees who were not of Iranian descent had been retained even though they also lacked security clearances. *Id.* at 552–54.

Relying on *Zeinali*, Johnson argues *Egan* does not bar this court from considering whether transfer to a non-sensitive position was feasible. Again, we need not decide whether to adopt the distinction made in *Zeinali* because Johnson's case does not fit it. Unlike in *Zeinali*, Johnson vehemently disputes

the merits of the Navy's findings, which the DOD CAF credited in revoking his security clearance. While he claims to only be challenging Raytheon's actions, and not directly challenging the Navy's actions, his position is nonetheless that the Navy, and in turn the DOD CAF, was wrong. Moreover, Johnson has introduced no evidence that similarly situated employees were treated differently, i.e., that another employee was found by the Navy to have committed security violations warranting a revocation of his security clearance but was retained by Raytheon.

In sum, Johnson argues we should have jurisdiction to examine issues that do not call into question his security clearance decision, such as whether transfer to a non-sensitive position was feasible and whether a private party made false statements to the government. In a case that presented different facts, his position could have merit. But his is not that case. There is no dispute that Johnson's top-secret security clearance was revoked; he introduced no evidence concerning whether transfer to a non-sensitive position was feasible; and, on these facts, there is no way to assess whether Raytheon's statements were false without necessarily assessing whether the DOD CAF's decision, which credited the Navy's findings, was wrong. Johnson simply cannot get around the reality that to show that Raytheon fired him even though it knew the Navy's findings were wrong would require assessing the validity of the DOD CAF's decision, which *Egan* and *Perez* forbid. Accordingly, we lack subject-matter jurisdiction to consider Johnson's claims that Raytheon retaliated against him by monitoring him, making false accusations about him to the Navy, and firing him.

## B. Prima Facie Case of FCA Retaliation

Johnson's remaining FCA retaliation claim—that Raytheon retaliated against him when Slater told him to not share his concerns with the Navy— is not barred by *Egan*, and we therefore proceed to the merits of this claim.

No. 21-11060

Under the first step of the *McDonnell Douglas* framework, Johnson "must first establish a prima facie case of retaliation by showing: (1) that he engaged in protected activity; (2) that the employer knew about the protected activity; and (3) retaliation because of the protected activity." *Musser*, 944 F.3d at 561; *see also Diaz*, 820 F.3d at 176 (describing elements of the prima facie case somewhat differently). Raytheon did not dispute that Johnson engaged in protected activity; however, it argued that Johnson's purported act of retaliation—Slater advising Johnson to not share his concerns with the Navy—is not a materially adverse employment action that amounts to retaliation. The district court agreed.[7] We agree as well.

"[A] retaliatory act must be 'materially adverse, which . . . means it well might have dissuaded a reasonable worker from' engaging in protected activity." *United States ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 326 (5th Cir. 2016) (second alteration in original) (quoting *Halliburton, Inc. v. Admin. Review Bd.*, 771 F.3d 254, 259 (5th Cir.2014)). The FCA includes a non-exhaustive list of examples of actionable retaliation, including "discharge[ ], demot[ion], suspen[sion], threat[s, and] harass[ment]." *Id.* (alterations in original) (quoting § 3130(h)(1)).

Under certain circumstances, a request to cease protected conduct may be a materially adverse action. *See, e.g.*, *Fallon v. Potter*, 277 F. App'x 422, 428 (5th Cir. 2008) (unpublished). For example, Johnson cites *Fallon*, 277 F. App'x at 428, in which we held in the Title VII context that an issue of material fact precluded summary judgment as to whether multiple direct

---

[7] Although the district court held Johnson's claims for Raytheon monitoring him, reporting his conduct to the Navy, and ultimately firing him were barred by *Egan*, it held in the alternative that Johnson had not presented a prima facie case of retaliation as to these three actions and that Johnson could not show Raytheon's reasons for monitoring and reporting him were pretextual. Because we hold these claims are barred by *Egan*, we need not address these alternative holdings.

statements from a supervisor to an employee to not file a discrimination complaint could have dissuaded a reasonable employee from pursuing the claim, and would therefore have constituted retaliation. In that case, the employee's direct supervisor told the employee: (1) "You just keep filing those EEO complaints and I promise you one thing—there won't be a person in this post office to testify against me"; (2) "You need to call her [an EEOC officer] and talk to her so you can drop this EEO"; (3) "You need to tell her you don't need redress . . . cause you're canceling the EEO complaint;" and "(4) You'll never have anyone in this post office stand up for you. If you continue to file these charges, I'll show you what you're up against." *Id.* On the other hand, in *Hernandez v. Johnson*, 514 F. App'x 492, 498–99 (5th Cir. 2013) (unpublished)—relied on by Raytheon—we distinguished *Fallon*, affirming the grant of summary judgment for an employer on a Title VII retaliation claim. There, the employee's first-level supervisor called the employee at home and stated "she felt threatened by [the employee] telling her about his prior EEO activity." *Id.* at 495. We concluded this "single statement that was not even a direct threat was not a materially adverse employment action." *Id.* at 499. While these cases are unpublished and nonbinding, they are persuasive. *See Light-Age, Inc. v. Ashcroft-Smith*, 922 F.3d 320, 322 n.1 (5th Cir. 2019) (per curiam) (noting our unpublished opinions issued after January 1, 1996, are "persuasive authority").

Here, Raytheon's conduct is more similar to that in *Hernandez*. Johnson points to two instances of a single Raytheon employee advising him not to report his concerns to the Navy. These statements did not contain threats, and Slater—the one who made these statements—was not Johnson's supervisor. Such conduct would not have "dissuaded a reasonable worker from" reporting to the Navy. *See Bias*, 816 F.3d at 326 (quoting *Halliburton*, 771 F.3d at 259). Because Johnson failed to make out a prima facie case of retaliation as a matter of law, summary judgment was appropriate.

No. 21-11060

## C. Rule 56(d) Request for Additional Discovery

Finally, Johnson argues that the district court abused its discretion in denying his Rule 56(d) request for additional discovery. Rule 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

According to Johnson's Rule 56(d) declaration, his aim in seeking additional discovery was largely to gather evidence that Raytheon knew that he had not violated any security policies, both when it reported him to the Navy and when it terminated him, as well as to gather evidence to dispute that the Navy's investigation was independent and to prove that its conclusions were wrong. As explained, Johnson's arguments that Raytheon knew he had not violated security policies and that the Navy's investigation was based on false reports is barred by *Egan*, and the district court did not abuse its discretion in denying related discovery because the evidence requested would not have affected the court's ruling on the motion as a matter of law. *See Smith*, 827 F.3d at 423. As to Johnson's sole claim that survives *Egan*—that Raytheon retaliated against him in advising him not to report his concerns to the Navy—Johnson has not cited to any specific facts that he needed and was prevented from discovering that would create a genuine dispute of material fact as to whether the action was materially adverse. *See id.* The district court did not abuse its discretion in denying Johnson's Rule 56(d) request.

## IV. CONCLUSION

The judgment of the district court is AFFIRMED.

22

No. 21-11060

Stephen A. Higginson, *Circuit Judge*, dissenting:

This case was argued in August of 2022. The parties will benefit greatly from closure. So, I confine my dissent to disagreement with the extension of *Department of the Navy v. Egan*, 484 U.S. 518 (1988) to bar Article III judicial review from this private-sector, whistleblower employment-termination dispute. *See Zeinali v. Raytheon Co.*, 636 F.3d 544, 549-52 (9th Cir. 2011) (explaining that "no case . . . has ever adopted a bright-line rule as broad as the one suggested by Raytheon" because "Raytheon's approach would essentially immunize government contractors from any liability in cases involving employees whose security clearances are revoked or denied"). In *Webster v. Doe*, 486 U.S. 592, 603 (1988), the Supreme Court clarified that Congress must speak clearly when it intends to bar judicial review altogether. Indeed, scholarship that is critical of courts' overexpansive interpretation of *Egan* points out that, "[a]s of 2019, a staggering 2.5% of the entire civilian labor force—well over 4 million people—have been adjudicated eligible to hold a clearance, of which over 2.94 million had access to classified information." Max Jesse Goldberg, *Security-Clearance Decisions and Constitutional Rights*, 132 Yale L.J.F. 55, 70 (2022). Because I would not extend *Egan*'s narrow statutory bar to insulate from judicial review adverse actions taken by government contractors—here, an allegedly pretextual and retaliatory action against a whistleblower—I respectfully dissent.