In the

# United States Court of Appeals
## For the Seventh Circuit

No. 23-1392

MELODY PAK, *et al.*,

*Plaintiffs-Appellants*,

*v.*

JOSEPH R. BIDEN, JR., *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 22-cv-00250-slc — **Stephen L. Crocker**, *Magistrate Judge*.

ARGUED SEPTEMBER 26, 2023 — DECIDED JANUARY 31, 2024

Before WOOD, SCUDDER, and ST. EVE, *Circuit Judges*.

WOOD, *Circuit Judge*. This case tells the tale of four Iranian
nationals who hoped to obtain visas to enter the United States.
They wanted to reunite with their family members—three
U.S. citizens and one lawful permanent resident—who reside
in this country. But the story does not have a happy ending,
both because of the applicants' history and because of the lim-
its on judicial review of consular action. Decades ago, these
four people completed mandatory military service in Iran's

Islamic Revolutionary Guard Corps (IRGC). After the IRGC was formally designated a terrorist organization many years later, in 2019, consular officers denied all four visa applications on terrorism-related inadmissibility grounds (TRIG). None of the applicants was granted a TRIG exemption. The four visa applicants and their family members (together, the Plaintiffs) then filed this action.

They brought various claims against the President of the United States and several federal officials responsible for investigating, processing, and adjudicating immigrant visa applications. Plaintiffs allege that Defendants have a systemic practice of depriving visa applicants the opportunity to establish eligibility for TRIG exemptions, and that this practice violates their rights under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A) and (D), and the Fifth Amendment's Due Process Clause.

The district court determined that the doctrine of consular nonreviewability precludes judicial review of this action and dismissed it under FED. R. CIV. P. 12(b)(6). Because the Supreme Court's decisions in *Kleindienst v. Mandel*, 408 U.S. 753 (1972), and *Kerry v. Din*, 576 U.S. 86 (2015), leave no room for a contrary conclusion, we affirm.

## I

### A. Legal background

Under the Immigration and Nationality Act (INA or the Act), 8 U.S.C. § 1361, noncitizens bear the burden of establishing their eligibility for a visa to enter the United States. Consular officers are responsible for determining whether a visa applicant is inadmissible under any provision of the Act. Generally, consular officers must provide notice to the applicant

that "states the determination" and "lists the specific provision or provisions of law under which" a denial is based. *Id.* § 1182(b)(1). But the government is exempt from this notice requirement when an application is denied based on terrorism or national security concerns. *Id.* § 1182(b)(3).

For purposes of the INA, a "terrorist organization" is an organization:

(I)     Designated under section 1189 of [Title 8];

(II)    Otherwise designated, upon publication in the Federal Register, by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security, as a terrorist organization, after finding that the organization engages in [terrorist] activities … ; or

(III)   That is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup that engages in, [terrorist] activities.

*Id.* § 1182(a)(3)(B)(vi).

These three types of terrorist organizations are known as Tier I, Tier II, and Tier III terrorist organizations, respectively. As the text indicates, Tier I and Tier II terrorist organizations are formally designated. In contrast, consular officers determine on a case-by-case basis whether an organization qualifies as a Tier III terrorist organization.

Section 1182(a)(3)(B) of the INA sets forth a long list of "[t]errorism activities" that constitute grounds for inadmissibility. A consular officer need only "know[] or ha[ve] reason to believe" that the applicant meets any of these grounds to deny a visa application. *Id.* § 1201(g). One such ground

applies if an applicant "has received military-type training … from or on behalf of any organization that, at the time the training was received, was a [Tier I, II, or III] terrorist organization." *Id.* § 1182(a)(3)(B)(i)(VIII).

The INA also provides the Executive Branch discretionary authority to grant waivers and exemptions to certain groups and individuals who otherwise would be inadmissible on terrorism-related grounds. According to the Foreign Affairs Manual issued by the State Department, exemptions cannot be granted to applicants who "voluntarily and knowingly received military-type training from a Tier I or II terrorist organization." Visa applicants may overcome ineligibility for an exemption under this provision by establishing that their past terrorism activities occurred "under duress or without relevant knowledge." In the end, however, section 1182(d)(3)(B)(i) authorizes the Secretaries of State and Homeland Security (after consultation with each other and the Attorney General), to determine in their "sole unreviewable discretion" that an applicant should (or should not) be exempt from section 1182(a)(3)(B).

### B. Factual allegations

The district court's opinion provides a thorough review of the factual allegations pertinent to this case; we only summarize them. See *Pak v. Biden*, No. 22-cv-250-slc, 2023 WL 22077 (W.D. Wis. Jan. 3, 2023). Plaintiffs Ali Pak, John Doe 2, Vahid Fatouraee, and Armin Fathinejad are four law-abiding Iranian nationals who applied between 2014 and 2020 for visas to enter the United States. Ali Pak hoped to reunite with his daughter, Plaintiff Melody Pak, a lawful permanent resident completing her Ph.D. in the United States. Plaintiffs John Doe 1, Maryam Fatouraei, and Kambiz Fathinejad, are U.S. citizens

who filed family-based petitions on behalf of John Doe 2, Vahid Fatouraee, and Armin Fathinejad.

At various points between 1980 and 2008, the four visa-applicant plaintiffs had completed mandatory military service in the IRGC—a branch of the Iranian military to which they were randomly assigned. They allege that their service was entirely nonmilitary, consisting instead of civil-service tasks such as washing dishes, handing out clothing to underserved communities, and building infrastructure in rural areas. As part of the visa application process, each of them submitted their IRGC military identification card. These cards provide basic identifying information such as height, weight, eye color, years of service, and military rank.

On April 8, 2019, the State Department formally designated the IRGC a Tier I terrorist organization. See *In re Designation of the IRGC (and Other Aliases) as a Foreign Terrorist Organization*, 84 Fed. Reg. 15278 (Apr. 15, 2019). Consular officers then began refusing visas to applicants who served in the IRGC after April 2019, citing section 1182(a)(3)(B). But consular officers also issued denials to the four visa-applicant plaintiffs here, each of whom completed their service in the IRGC long before it was designated a Tier I terrorist organization. The denial notices that they received provided no explanation other than a citation to section 1182(a)(3)(B).

Plaintiffs allege that when the visa-applicant plaintiffs requested that they be considered for a TRIG exemption, Defendants provided inconsistent, and occasionally inaccurate, information on how or whether they could apply for an exemption. For example, when three of the visa-applicant plaintiffs contacted the embassy to inquire about the exemption process, they were directed to file a waiver application with

United States Citizenship and Immigration Services (USCIS). That advice was just wrong: USCIS lacks the authority to waive TRIG ineligibility. Some of the visa-applicant plaintiffs submitted written statements to the embassy, explaining that their service in the IRGC consisted of civil-service tasks, that they never received military-type training, and that they had no knowledge at the time of service that the IRGC was a terrorist organization (nor could they have known, given that the designation came more than a decade later). None of the visa-applicant plaintiffs was granted a TRIG exemption, nor were they even offered an explanation.

On May 5, 2022, Plaintiffs filed this action. They allege that Defendants have a systemic practice of depriving visa applicants of the opportunity to establish eligibility for TRIG exemptions, and that as a result, Plaintiffs have suffered immeasurable hardship from having been physically separated from their family members. Plaintiffs brought claims under the APA, the doctrine recognized in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) (requiring agencies to follow their own rules and procedures), and the Due Process Clause of the Fifth Amendment. They seek a writ of mandamus ordering Defendants to implement a process for considering visa applicants for TRIG exemptions consistently and in good faith. See 28 U.S.C. § 1361.

The district court ruled that the doctrine of consular non-reviewability precluded judicial review of Plaintiffs' claims. On that basis, it granted Defendants' motion to dismiss the action under FED. R. CIV. P. 12(b)(6). See *Pak, supra*, 2023 WL 22077 at *15; see also *Morfin v. Tillerson*, 851 F.3d 710, 711 (7th Cir. 2017) (holding that consular nonreviewability is an issue

of a case's merits rather than of the court's subject matter jurisdiction). Plaintiffs now appeal.

## II

"Congress has delegated the power to determine who may enter the country to the Executive Branch, and courts generally have no authority to second-guess the Executive's decisions." *Yafai v. Pompeo*, 912 F.3d 1018, 1020 (7th Cir. 2019) (citing *Mandel*, 408 U.S. at 769–70). The doctrine of consular nonreviewability stems from these separation-of-powers principles. It instructs that ordinarily, visa decisions made by consular officers abroad are not subject to judicial review. *Hazama v. Tillerson*, 851 F.3d 706, 708 (7th Cir. 2017). In an effort to circumvent this doctrine, Plaintiffs insist that they do not seek judicial review of any individual consular officer's decision. Rather, they frame this action as a challenge to the legal structure that Defendants have erected for processing TRIG exemptions.

The proper characterization of the claims before us is a question of law, and thus something we decide independently. We begin with a fundamental point: Plaintiffs have standing to assert their claims only because consular officers denied visas to four of them (thereby inflicting injury in fact, caused by the officer's decision, and redressable by mandamus). Moreover, the doctrine of consular nonreviewability applies even where a plaintiff challenges some other, related aspect of a consular officer's decision to deny a visa. For example, in *Matushkina v. Nielsen*, the plaintiff ostensibly challenged a Customs and Border Patrol inadmissibility determination that had formed the basis of the unfavorable visa decision. 877 F.3d 289, 295 (7th Cir. 2017). We described this as an "indirect attack" on the visa denial itself, and therefore held

that it fell within the scope of consular nonreviewability. *Id.* The same logic applies here, as we cannot review a TRIG exemption determination without first assessing a consular officer's inadmissibility determination.

Similarly, Plaintiffs cannot shield their claims from the doctrine of consular nonreviewability by "repackaging [their] substantive complaints as procedural objections." See *Doe v. McAleenan*, 926 F.3d 910, 911 (7th Cir. 2019). Although some consular officers did not pursue a TRIG exemption on behalf of the visa-applicant plaintiffs and others provided misinformation on how to seek an exemption, what Plaintiffs really want is to be granted TRIG exemptions (or to have exemptions granted for their close relatives). Yet Congress left exemption determinations to the "sole unreviewable discretion" of the Secretaries of State and Homeland Security, 8 U.S.C. § 1182(d)(3)(B)(i), which makes Plaintiffs' choice to target the exemption process particularly untenable. Because Plaintiffs' claims cannot be divorced from a substantive challenge to the Executive's discretionary decisions, we must presume that their claims are unreviewable. *Matushkina*, 877 F.3d at 295.

### III

But our inquiry does not end there. *Mandel* identified a narrow exception to the doctrine of consular nonreviewability. This exception applies when a visa denial implicates the constitutional rights of a U.S. citizen. See 408 U.S. at 769–70. Even then, however, a court may not "look behind" the consular officer's decision if it is based on a "facially legitimate and bona fide reason." *Id.*; see also *Yafai*, 912 F.3d at 1021.

Invoking this exception, Plaintiffs urge that the Due Process Clause of the Fifth Amendment protects the right of a

U.S. citizen to live with his or her family members. Even assuming that there is such a right, its "status … is uncertain." *Yafai*, 912 F.3d at 1021. In *Din*, the Supreme Court split on the question whether a U.S. citizen has a cognizable interest in living with his or her spouse: four Justices would have held that the plaintiff did have such an interest, three said the plaintiff did not, and two assumed for the sake of argument that such an interest existed. See generally 576 U.S. 86 (2015). We have refrained from taking a position on the issue since *Din*, and once again, we see no reason to do so for purposes of the present case. See *Yafai*, 912 F.3d at 1021. We instead assume for the sake of argument that the denials of the visa-applicant plaintiffs' applications did implicate the constitutional rights of their U.S. citizen family members. (As the district court observed, this path is not available to Plaintiff Melody Pak, who is a noncitizen lawful permanent resident.)

Plaintiffs' claims nonetheless fail because the record contains no evidence that defeats the presumption that the consular officers' decisions were facially legitimate and *bona fide*. The Supreme Court repeatedly has held that the government need only provide a citation to a valid statutory provision to support a visa denial. See *Din*, 576 U.S. at 105 (Kennedy, J., concurring); see also *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018). In *Din*, the Court confronted the very statutory provision at issue here. Justice Kennedy's concurrence controls. He concluded that because section 1182(a)(3)(B) "specifies discrete factual predicates that the consular officer must find to exist before denying a visa," a citation to it suffices to show that the consular officer's decision was facially legitimate and *bona fide*. 576 U.S. at 105–06 (Kennedy, J., concurring). We note, however, that at least one other court has found that this is not necessarily true of other statutory provisions. See

*Muñoz v. United States Dep't of State*, 50 F.4th 906, 917–18 (9th Cir. 2022) (concluding that section 1182(a)(3)(A)(ii) does not "specif[y] discrete factual predicates," and so the government must identify "a fact in the record" to support a visa denial based on that provision), *cert. granted in part sub nom. Dep't of State v. Muñoz*, No. 23-334, 2024 WL 133818, at *1 (U.S. Jan. 12, 2024). In our view, the issue in *Muñoz* is distinct from the one before us, and so we do not need to hold this case for the Supreme Court's ruling.

The record in the present case supplies "at least a facial connection to terrorist activity," and this is enough to support the challenged visa denials. 576 U.S. at 105 (Kennedy, J., concurring). Each visa-applicant plaintiff completed miliary service in the IRGC—a branch of the Iranian military that later was designated a Tier I terrorist organization. Each of them submitted their IRGC military identification card to the consular officer as part of the visa application process. The record thus "forecloses any contention that the [consular officers were] imagining things." *Morfin*, 851 F.3d at 713.

**IV**

Having determined that the challenged decisions are facially legitimate and *bona fide*, we have one more question to consider. *Din* recognized that an "affirmative showing of bad faith" that is "plausibly alleged with sufficient particularity" might justify more searching review. 576 U.S. at 105 (Kennedy, J., concurring). Our decision in *Yafai* left open the possibility that "evidence of behind-the-scenes bad faith can overcome *Mandel*'s rule that courts must stick to the face of the visa denial in evaluating it." 912 F.3d at 1022.

Whatever residual authority courts have to review visa decisions on this ground, the circumstances presented here do not trigger it. No evidence in the record suggests that any kind of improper bias, dishonest belief, or "illicit motive" lay behind the consular officers' decisions. *Id*. Plaintiffs point out that some of the applicants presented evidence to consular officers explaining that their military service consisted of menial civil-service tasks. But Plaintiffs conceded during oral argument that they presented this evidence *after* their visa applications were denied. This timing matters. In determining whether an applicant is eligible for a visa, consular officers are required to consider "[a]ll documents and other evidence presented." 22 C.F.R. § 41.105(a). We might be able to infer bad faith "if [an applicant] had presented strong evidence … that the consular officer refused to consider." *Morfin*, 851 F.3d at 713–14. Yet once a visa denial has been issued, no statute or regulation obligates consular officers to re-open an application just because new evidence has been presented.

Plaintiffs next ask us to infer bad faith from the fact that consular officers never prompted them to offer evidence (other than their military identification cards) about their service for the IRGC. But it was Plaintiffs' burden to present whatever evidence they had. In addition, we have no way of knowing whether some or all of the files contained other evidence, developed independently by the government, that supported the consular officers' decisions. In the present circumstances, we cannot draw an inference of bad faith without violating *Mandel*'s instruction not to "look behind" a consular officer's decision. 408 U.S. at 770. And, in matters concerning national security, this instruction carries "particular force." *Trump v. Hawaii*, 138 S. Ct. at 2419 (quoting *Din*, 576 U.S. at 104 (Kennedy, J., concurring)).

We are not without sympathy for these applicants; the frustration of not knowing why they failed to qualify for TRIG exemptions is undoubtedly great. We can only wonder why this was the outcome and who was ultimately responsible for it. The Foreign Affairs Manual allows for exemptions to "overcome ineligibility for past terrorist activity associated" with a Tier I terrorist organization "if the applicant acted under duress or without the relevant knowledge." It seems from the record before us that the visa-applicant plaintiffs are strong candidates for this criterion, as they completed their compulsory service long before the IRGC was designated a Tier I terrorist organization.

What Plaintiffs are really seeking, however, is an explanation for their visa denials and TRIG exemption determinations (or, perhaps a citation to the specific provision under section 1182(a)(3)(B) on which their visa denials were based). Yet the Supreme Court has made clear that a citation to section 1182(a)(3)(B) is all the explanation to which they are entitled. See *Din*, 576 U.S. at 105 (Kennedy, J., concurring). And Congress has unambiguously directed that TRIG exemption determinations be left to the Executive's "sole unreviewable discretion." See 8 U.S.C. § 1182(d)(3)(B)(i). In the absence of any serious allegations of bad faith, we lack the authority to review the challenged decisions.

The judgment of the district court is AFFIRMED.