In the

# United States Court of Appeals
## for the Seventh Circuit

---

No. 23-2304

DORED SHIBA,

*Plaintiff-Appellant,*

*v.*

MARKWAYNE MULLIN,
Secretary of Homeland Security,[*]

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 22 C 2357 — **Matthew F. Kennelly**, *Judge.*

---

ARGUED MARCH 5, 2024 — DECIDED APRIL 23, 2026

---

Before SYKES, LEE, and KOLAR, *Circuit Judges.*

SYKES, *Circuit Judge.* Dored Shiba applied for a position as
a citizenship and immigration assistant with the United States
Citizenship and Immigration Services ("USCIS") and was ten-
tatively selected for appointment. The job required a security

---

[*] We have substituted Markwayne Mullin, the current Secretary of Home-
land Security. *See* FED. R. APP. P. 43(c)(2).

clearance, but Shiba's background investigation stalled when the agency discovered serious issues that required further inquiry. When the security concerns remained unresolved for more than a year, the agency rescinded its offer.

Shiba sued the Secretary of Homeland Security alleging that the stalled investigation was not attributable to legitimate security concerns but instead was a pretext for retaliation in violation of the Rehabilitation Act. He claimed that the Department of Homeland Security had blacklisted him from federal employment based on his prior complaints and litigation accusing the agency of disability discrimination during a previous period of employment.

The Secretary moved to dismiss the suit under the Supreme Court's decision in *Department of the Navy v. Egan*, 484 U.S. 518 (1988). *Egan* held that security-clearance decisions, which involve sensitive and inherently discretionary judgments on matters of national security, are committed to the Executive Branch and are unreviewable by the courts. 484 U.S. at 527–30. The district judge agreed that *Egan* barred Shiba's suit and dismissed the case for lack of subject-matter jurisdiction.

On appeal the parties devote most of their attention to the *scope* of *Egan*'s limitation on judicial review—i.e., whether it applies to Shiba's case. But there is an antecedent question about the *nature* of the *Egan* rule: Is it a limit on the court's subject-matter jurisdiction—as the district judge held and the parties have assumed—or instead a nonjurisdictional limit on judicial review of claims that fall within its scope?

*Egan* is best understood in the latter sense. As a rule of mandatory deference to the Executive Branch's security-

clearance decisions, *Egan* functionally forecloses judicial review of claims within its reach. But it does not affect the court's adjudicative power.

Returning to the scope of the *Egan* rule, we conclude that Shiba's retaliation claim falls within it. Resolving the merits of his claim—and in particular, his claim of pretext—would require the court to second-guess the agency's reasons for withholding a security clearance. That's exactly what *Egan* prohibits. We therefore modify the district court's judgment to reflect a merits-based dismissal rather than a jurisdictional dismissal. As modified, we affirm the judgment.

## I. Background

This case comes to us at the pleading stage, so we take the following factual account from Shiba's complaint, accepting his allegations as true for present purposes.[1] Shiba's employment with the Department of Homeland Security began in April 2007 when he was hired as an Immigration Information Officer and assigned to the USCIS field office in Chicago. Two months later he suffered an on-the-job injury that left him unable to work, so he took unpaid medical leave. By June 2010—that is, three years later—his injury had still not fully resolved and he remained unable to work, so the agency fired him. Shiba challenged the termination before the Merit Systems Protection Board, which handles federal personnel disputes. *See* 5 U.S.C. §§ 7513, 7701. The Board ordered the agency to permit him to return to work with restrictions to accommodate his injury.

---

[1] A few aspects of this factual account appear in Shiba's appellate briefs. We include them because they are consistent with the pleadings. *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013).

Almost immediately, Shiba suffered a recurrence of his original injury, which prompted yet another period of unpaid leave. In 2011, while he was still on leave, Ruth Dorochoff, the District Director of the USCIS in Chicago, referred him to the Office of Inspector General ("OIG") for investigation. She accused Shiba of accepting improper gratuities for representing refugees before the United Nations Refugee Agency.

After a two-year investigation, the Inspector General was unable to substantiate Dorochoff's allegations that Shiba had accepted prohibited private compensation while employed by the USCIS. But the investigators found at least two other rules violations. First, Shiba had impermissibly leveraged his federal position when contacting the Refugee Agency to inquire about the status of Iraqi refugees. And second, he lied on his employment application: He represented that he had never been fired from another job, when in fact he had resigned from prior employment at the Social Security Administration to avert his impending termination. In August 2014 the USCIS fired Shiba, saying only that he served "at the pleasure" of the agency.

Three years later, in June 2017, Shiba sought reemployment with the Department—this time as an officer with Immigration and Customs Enforcement. Although he was tentatively selected for the position, his background check dragged on for almost a year without successful completion, so the agency rescinded its offer. Blaming the stalled background check on the Inspector General's investigation, Shiba sued the Secretary of Homeland Security alleging that his 2014 discharge and the rescission of his subsequent job offer were motivated by disability discrimination. That suit was

resolved in the Secretary's favor at summary judgment, and Shiba's appeal is under advisement.

In July 2019 Shiba again applied for a position with the Department, this time as a citizenship and immigration assistant in the USCIS Asylum Office in Chicago. He again was tentatively selected, but the job requires a security clearance, so the agency initiated a background investigation. *See* Exec. Order No. 12,968, 60 Fed. Reg. 40245 (Aug. 2, 1995). Like Shiba's previous background check, this investigation also stalled: The USCIS Personnel Security Division discovered serious issues that jeopardized his clearance. Investigators also learned that another agency had a background check in progress, so they decided to wait until that investigation was complete. When a year passed without the issuance of a security clearance, the USCIS rescinded its job offer.

Shiba filed a complaint with the Equal Employment Opportunity Commission and eventually initiated a second lawsuit against the Secretary of Homeland Security alleging that the Department delayed his security clearance in retaliation for his protected activity—namely, his 2010 administrative complaint with the Merit Systems Protection Board and his first lawsuit alleging disability discrimination. This second suit raised a retaliation claim under the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*

The Secretary moved to dismiss the suit for lack of subject-matter jurisdiction, *see* FED. R. CIV. P. 12(b)(1), arguing that Shiba's retaliation claim was barred by the Supreme Court's decision in *Egan*, which held that decisions regarding security clearances are committed to the discretion of the Executive Branch and are not judicially reviewable. 484 U.S. at 529–30. Because Shiba's retaliation claim challenged the agency's

reasons for withholding his security clearance, the Secretary argued that the court lacked the power to adjudicate it under *Egan*.

Shiba urged the court not to apply the *Egan* rule because his claim includes allegations that Dorochoff's referral to the OIG was knowingly false. As support for this argument, he relied on the D.C. Circuit's divided decision in *Rattigan v. Holder*, which carved out an exception to *Egan* for what the court called "reporting and referral claims." 689 F.3d 764, 770 (D.C. Cir. 2012). More specifically, the majority in *Rattigan* held that an employment-discrimination claim premised on allegations of a "knowingly false" security report or referral "can coexist with *Egan*." *Id.*

The district judge declined the invitation to follow the D.C. Circuit's reasoning in *Rattigan*, holding instead that Shiba's claim was squarely controlled by *Egan*'s rule barring the judiciary from reviewing security-clearance decisions. The judge accordingly granted the Secretary's Rule 12(b)(1) motion and dismissed the suit for lack of subject-matter jurisdiction.

## II. Discussion

On appeal Shiba asks us to reinstate his retaliation claim for two reasons. First, he argues that the *Egan* rule does not apply because the USCIS never actually made a security-clearance decision but instead rescinded its job offer when his background investigation stalled. Alternatively, he urges us to follow the D.C. Circuit's lead in *Rattigan* and recognize a "narrow exception" to *Egan* for employment-discrimination claims based on allegations of "knowingly false" security reports. He insists that his claim can proceed under a *Rattigan-*

like exception. Unsurprisingly, the Secretary defends the dismissal of Shiba's suit, arguing that *Egan* bars his claim and no exception applies.

As we've noted, the parties overlooked a threshold question: whether *Egan*'s limitation on judicial review—whatever its scope—deprives the court of subject-matter jurisdiction or instead forecloses review of the plaintiff's claim on the merits. After oral argument, we ordered the parties to submit supplemental briefs addressing that question. They complied, and their filings agree that *Egan* imposes a jurisdictional limit on judicial review, though they disagree on the rationale for that position.

We appreciate the impulse to attach a jurisdictional label to the rule announced in *Egan*. As explained below, however, we read the case differently. The *Egan* principle, which is an application of the political-question doctrine, does not limit the court's subject-matter jurisdiction. It instead operates as a rule of finality, or put somewhat differently, as a mandatory rule of deference to the Executive Branch's security-clearance decisions.

The second issue on appeal is whether Shiba's retaliation claim falls within the *Egan* rule. It does. And we're not inclined to create an exception to *Egan* like the D.C. Circuit's in *Rattigan*. It's not clear to us that *Rattigan* is correct, but this case does not require us to decide. Shiba's claim is distinguishable in any event.

## A. Jurisdiction

We begin with the jurisdictional question, and our analysis starts, as it must, with *Egan* itself. Thomas Egan, the plaintiff, was removed from his position as a laborer at the Trident

Naval Refit Facility after he was denied a required security clearance. *Egan*, 484 U.S. at 520. He sought administrative review of the discharge decision in the Merit Systems Protection Board, which is statutorily authorized to hear the appeals of federal personnel decisions. *Id.* at 522; *see* 5 U.S.C. § 7513(d). The full Board—in its version of en banc review—unanimously sustained the decision to remove Egan, concluding that it lacked authority under § 7513 to second-guess the propriety of a security-clearance determination. *Egan*, 484 U.S. at 524.

In a divided decision, the Federal Circuit reversed. The majority held that § 7513 entitled Egan to *complete* review of the Navy's removal decision, "including review … of the underlying agency determination to deny a security clearance." *Id.* at 525. Chief Judge Markey dissented, relying heavily on the constitutional principle of separation of powers. As he explained, both the Board and the federal courts lack "institutional competence" to review matters of national security, for which the Constitution assigns primary responsibility to the Executive Branch. *Egan v. Dep't of the Navy*, 802 F.2d 1563, 1580–81 (Fed. Cir. 1986) (Markey, C.J., dissenting).

The Supreme Court granted the Navy's petition for certiorari and essentially vindicated Chief Judge Markey's dissenting view. The Court explained that security-clearance decisions require "sensitive and inherently discretionary judgment call[s]" regarding matters of national security—judgments that are "committed by law to … the Executive Branch." *Egan*, 484 U.S. at 527. By virtue of the President's role as "Commander in Chief of the Army and Navy of the United States," U.S. CONST. art. II, § 2, the Constitution vests the Executive with the exclusive authority to "control access to

information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position" that requires access to such information. *Egan*, 484 U.S. at 527. That authority includes deciding when, whether, and to whom to grant a security clearance.

As the Court observed, the issuance of a security clearance requires a predictive judgment about a person's future behavior and an assessment of the risk that "he might compromise sensitive information." *Id.* at 528. Judgments like these "must be made by those with the necessary expertise in protecting classified information"; a "nonexpert body" cannot "review the substance of such a judgment" or "decide whether the agency should have been able to make the necessary affirmative prediction with confidence." *Id.* at 529. "Nor can such a body determine what constitutes an acceptable margin of error in assessing the potential risk." *Id.* Accordingly, the Executive Branch agency tasked with protecting that information must have "the final say" in deciding matters related to security clearances. *Id.* (quotation omitted).

This finality rule, the Court explained, implements the "generally accepted view" that foreign policy is "the province and responsibility of the Executive." *Id.* (quotation omitted). It also accords with the judiciary's traditional reluctance "to intrude upon the authority of the Executive in military and national security affairs." *Id.* at 530.

Importantly, *Egan* does not speak in jurisdictional terms. Absent from the Court's opinion is any indication that the "final say" rule deprives the courts of adjudicative authority over claims within its scope—or in jurisdiction-speak, implicates the court's "statutory or constitutional *power* to

adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).

To be sure, the term "jurisdiction" appears occasionally in the Court's opinion. Shiba relies on these references to conclude that the *Egan* rule is jurisdictional. That reliance is misplaced. The Court used the term "jurisdiction" only to describe the structure of the Merit Systems Protection Board and its statutory authority to review personnel decisions removing, suspending, furloughing, or reducing the pay or grade of covered federal employees. *See, e.g.*, *Egan*, 484 U.S. at 530 (explaining that the Board has "jurisdiction to review 'adverse actions'" limited to those listed above (quoting § 7513(d)). And even within this discussion of the administrative-appeal structure, the Court did not imply—much less hold—that the Board was divested of statutory authority to review an otherwise qualifying personnel decision that implicates a security-clearance determination. Quite the opposite; the Court explained that there was no claim in Egan's case that the Board lacked "jurisdiction to hear and adjudicate [his] appeal." *Id.* at 526.

The Court's decision was instead rooted in separation-of-powers principles—and more particularly, the Constitution's commitment of sensitive national-security decisions to the Executive Branch. *Egan* thus tracks the reasoning of other cases holding that when a decision is committed by law to the President's discretion, judicial review is not available. *See Dalton v. Specter*, 511 U.S. 462, 474–76 (1994) (citing cases); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) ("Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."). This is so, the Court has said, because "the

exercise of [the President's] discretion" gives rise to no "question of law." *United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940). Accordingly, when the Executive resolves a question that the Constitution assigns to his discretion, his decision "is conclusive on the judicial department." *Williams v. Suffolk Ins. Co.*, 38 U.S. 415, 420 (1839). It is not "the province" of the court to determine "whether the executive be right or wrong"; "[i]t is enough to know[] that in the exercise of his constitutional functions, he has decided the question." *Id.*

*Egan*'s reasoning situates the "final say" rule squarely within the modern framework of the Court's political-question doctrine, albeit without specifically saying so. Derived from the constitutional separation of powers, the political-question doctrine excludes from judicial review certain questions that "revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress" or "the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986).

In *Baker v. Carr*, the seminal decision synthesizing the modern version of the doctrine, the Court defined a political question according to these six canonical factors:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] a lack of judicially discoverable and manageable standards for resolving it; [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due

coordinate branches of government; [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962).

If an issue qualifies as a political question, it is said to be "nonjusticiable"—in other words, inappropriate for judicial resolution. *Id.* at 198. And as the Court has explained in addressing the political-question doctrine in another context, "the doctrine of separation of powers is more properly considered in determining whether the case is 'justiciable," not whether the court has "jurisdiction over the subject matter of th[e] case." *Powell v. McCormack*, 395 U.S. 486, 512 (1969).

*Egan* unambiguously invokes *Baker*'s first factor, holding that Article II of the Constitution commits sensitive and discretionary security-clearance decisions "to the appropriate agency of the Executive Branch." 484 U.S. at 527. And references to several other *Baker* factors are readily apparent elsewhere in the opinion. As we've noted, the Court observed that "it is not reasonably possible for a nonexpert body"—in other words, a court—to review the substance of a security-clearance decision or assess the agency's predictive judgment about an applicant's potential security risk. *Id.* at 529. The Court also discussed the judiciary's traditional reluctance to intrude on the Executive's authority in national-security and military matters. *Id.* This analysis hews closely to the *Baker* framework—notably the third and fourth factors.

It's no surprise, then, that the Secretary's supplemental filing describes *Egan* as an application of the political-question doctrine. We agree. And we are in good company in doing so. *See Lee v. Garland*, 120 F.4th 880, 888 (D.C. Cir. 2024). But it doesn't follow, as the Secretary argues, that *Egan* necessarily imposes a limitation on a court's subject-matter jurisdiction.

True, the Supreme Court has sometimes described the political-question doctrine as jurisdictional in character. *See Rucho v. Common Cause*, 588 U.S. 684, 696 (2019) (A nonjusticiable political question lies "outside the courts' competence and therefore beyond the courts' jurisdiction."). But not invariably so. In *Nixon v. United States*, for example, the Court affirmed, on political-question grounds, the nonjurisdictional dismissal of former Judge Walter Nixon Jr.'s claim that a Senate procedural rule violated the Impeachment Trial Clause. 506 U.S. 224, 238 (1993). And in *United States Department of Commerce v. Montana*, the Court said that when "an issue presents a nonjusticiable political question, [the court] *declines* to address the merits of that issue." 503 U.S. 442, 457–58 (1992) (emphasis added).

Several scholars have likewise argued that the political-question doctrine does not impose a jurisdictional constraint on the federal courts. Professor John Harrison, for example, has described the doctrine as one that accords finality to certain decisions committed to the discretion of the political branches and forecloses prospective remedies that risk interfering with their discretionary judgments; he argues that the doctrine, as traditionally and properly understood, "does not rest on limits on the federal courts' authority to decide cases." John Harrison, *The Political Question Doctrines*, 67 AM. U. L. REV. 457, 460, 509 (2017). Professor Tara Leigh Grove has also

traced the origins of the doctrine, explaining that it histori-cally required courts "to enforce and apply the determina-tions of the federal political branches on 'political questions'" but did not constrain their jurisdiction. Tara Leigh Grove, *The Lost History of the Political Question Doctrine*, 90 N.Y.U. L. REV. 1908, 1911 (2015).

History and tradition aside, there are structural reasons to question the view that the political-question doctrine enforces a limit on the adjudicative power of the courts. Most obvi-ously, rules derived from Article III's "case or controversy" requirement constrain only the *federal* courts. *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989). Yet *state* courts surely have no greater freedom to interfere with the discretionary judgments of federal political actors. Scott Dodson, *Article III and the Political Question Doctrine*, 116 NW. U. L. REV. 681, 704–10 (2021).

All this said, we do not need to pin down the jurisdictional status of every facet of the political-question doctrine to re-solve this case. Indeed, trying to do so would be quite an am-bitious endeavor: Over time the doctrine has taken different shapes and forms, covering everything from the legitimacy of Rhode Island's charter government, *see Luther v. Borden*, 48 U.S. (7 How.) 1 (1849), to the lawfulness of partisan gerry-mandering, *see Rucho*, 588 U.S. 684. Perhaps some of its appli-cations are jurisdictional while others are not, as at least one scholar has suggested. *See* Richard H. Fallon Jr., *Political Ques-tions and the Ultra Vires Conundrum*, 87 U. CHI. L. REV. 1481, 1492 (2020). For present purposes, it's enough to say that *Egan* recognizes a kind of political question but does not hold—either explicitly or implicitly—that its limitation on judicial review is jurisdictional.

Accordingly, we hesitate to assign jurisdictional significance to the *Egan* rule. Our reluctance to do so is consistent with Supreme Court and circuit precedent holding that the analogous doctrine of consular nonreviewability is not a limit on subject-matter jurisdiction. *Dep't of State v. Muñoz*, 602 U.S. 899, 908 n.4 (2024); *Matushkina v. Nielsen*, 877 F.3d 289, 294 n.2 (7th Cir. 2017).

The consular-nonreviewability doctrine bars judicial review of decisions regarding the issuance of visas "made by consular officials abroad." *Matushkina*, 877 F.3d at 294. Like the *Egan* rule, consular nonreviewability derives from the Constitution's separation of powers. *Pak v. Biden*, 91 F.4th 896, 900 (7th Cir. 2024). As the Supreme Court has recognized, "the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments.'" *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). Such decisions often "implicate relations with foreign powers" and reflect "changing political and economic circumstances." *Id.* (quotation omitted). Because federal courts lack expertise on these matters, they "have no authority to second-guess the Executive's decisions." *Yafai v. Pompeo*, 912 F.3d 1018, 1020 (7th Cir. 2019).

The consular-nonreviewability doctrine and the *Egan* rule rest on the same foundation. Both arise from the Executive Branch's authority over discretionary decisions regarding foreign policy and national security, and both mandate judicial deference to such decisions if later challenged. So whether the Executive Branch has denied a visa application or revoked a security clearance, its decision "is final and conclusive." *Muñoz*, 602 U.S. at 908 (quotation omitted). Judicial review is unavailable.

Key here, we held in *Matushkina* that the doctrine of con-sular nonreviewability concerns "a case's merits rather than the federal courts' subject matter jurisdiction." 877 F.3d at 294 n.2; *Hazama v. Tillerson*, 851 F.3d 706, 707 (7th Cir. 2017); *see also Allen v. Milas*, 896 F.3d 1094, 1101 (9th Cir. 2018) (explain-ing that the consular-nonreviewability doctrine is not a con-straint on subject-matter jurisdiction but instead a rule of deference). The Supreme Court agrees. *Trump*, 585 U.S. at 682; *see Muñoz*, 602 U.S. at 908 n.4 ("The Court explained [in *Trump v. Hawaii*] that the doctrine of consular nonreviewability is not jurisdictional … ."). If the consular-nonreviewability doctrine does not constrain a court's subject-matter jurisdiction, we struggle to see how *Egan*'s analogous limitation could.

The final reason why we do not read *Egan* as imposing a jurisdictional limit lies in how its rule has subsequently been described. Notably, neither we nor the Supreme Court has ever referred to *Egan*'s rule as jurisdictional in nature. On the contrary, several members of the Supreme Court have char-acterized it as a rule of judicial deference to the Executive Branch. *United States v. Zubaydah*, 595 U.S. 195, 216 (2022) (Thomas, J., concurring in part and concurring in the judg-ment); *Franklin v. Massachusetts*, 505 U.S. 788, 818 (1992) (Stevens, J., concurring in part and concurring in the judg-ment). We have too. *Grand Trunk Corp. v. Transp. Sec. Adm'n*, 153 F.4th 517, 525 (7th Cir. 2025); *Whitney v. Carter*, 628 F. App'x 446, 447 (7th Cir. 2016). And so have some of our sister circuits. *See Kaplan v. Conyers*, 733 F.3d 1148, 1155–56 (Fed. Cir. 2013); *Brazil v. U.S. Dep't of the Navy*, 66 F.3d 193, 196 (9th Cir. 1995).

We acknowledge that some circuits have used the term "subject-matter jurisdiction" (or variations of it) when

describing the *Egan* rule. *See, e.g.*, *United States ex rel. Johnson v. Raytheon Co.*, 93 F.4th 776, 789 (5th Cir. 2024); *Mowery v. Nat'l Geospatial-Intel. Agency*, 42 F.4th 428, 443 (4th Cir. 2022). As best we can tell, however, none has squarely addressed *Egan*'s jurisdictional status. And most of these cases simply rely on opinions that attached a jurisdictional label to *Egan*'s rule decades ago when courts reflexively "used the word 'jurisdiction' to refer to all doctrines that foreclose judicial review." *Builders Bank v. FDIC*, 846 F.3d 272, 274 (7th Cir. 2017). Modern cases like *Johnson* and *Mowery* rely on this outdated—and more importantly, unreasoned—circuit precedent, so their use of the term is entitled to minimal weight.

The Supreme Court has cautioned against reliance on unexplained—or "drive-by"—incantations of the term "jurisdiction." *Steel Co.*, 523 U.S. at 91. Indeed, the Court has acknowledged that some of its own cases have used the term in a "less than meticulous" manner. *Kontrick v. Ryan*, 540 U.S. 443, 454 (2004). And because harsh consequences attend "the jurisdictional brand," the Court has endeavored to "bring some discipline" to the use of the term and has instructed us to think twice before labeling a rule as jurisdictional. *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). That is so, the Court has said, even if a rule is "important and mandatory." *Id.*

We heed that instruction here. For all the reasons just discussed, we conclude that the *Egan* rule is not a jurisdictional limit. Instead, it imposes a rule of finality or mandatory judicial deference, making the Executive Branch's decisions on security-clearance matters conclusive and binding on the courts. In application, the distinction between a jurisdictional and a nonjurisdictional reading of *Egan* does not make a

practical difference. The upshot is the same: Where the *Egan* bar has been raised and applies, judicial review is unavailable and the court must dismiss the plaintiff's claim.

**B.  *Egan*'s Scope**

With the nature of the *Egan* rule settled, we turn to deciding whether it bars review of Shiba's claim. His suit does not, of course, directly challenge the withholding of his security clearance; it focuses on the USCIS's decision to rescind his employment offer. Even so, adjudicating Shiba's retaliation claim "would inevitably involve scrutiny" of the reasons for his delayed clearance. *El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 186 (3d Cir. 2010). Scrutinizing that decision is precisely what *Egan* forbids.

Shiba's retaliation claim necessarily requires an inquiry into why his security investigation stalled. He alleges that the agency delayed his clearance in retaliation for his statutorily protected activity—namely, his complaints and previous litigation accusing the Department of disability discrimination. Any other reason, he asserts, is pretexual.

But deciding whether Shiba's clearance was delayed for a "legitimate or pretextual" reason falls squarely within the *Egan* rule. *Brazil*, 66 F.3d at 197. Because decisions regarding security clearances are committed to the discretion of the Executive Branch, a court may neither "demand from the [agency] an explanation of its decision" nor permit "a factfinder to weigh [its] arguments in support of that decision." *El-Ganayni*, 591 F.3d at 185. To do either would intrude on the Executive Branch's discretion "to determine who may have access" to classified information and to decide "what constitutes an acceptable margin of error in assessing the potential

risk." *Egan*, 484 U.S. at 529. In short, a court cannot evaluate a claim of pretext "without running smack up against *Egan*." *Ryan v. Reno*, 168 F.3d 520, 524 (D.C. Cir. 1999).

Shiba resists this conclusion, but his arguments are meritless. As an initial matter, he contends that *Egan* does not foreclose review of his claim because his security clearance was never formally denied; rather, his background investigation lingered for a year until the USCIS finally rescinded its offer. True, but irrelevant. *Egan* doesn't distinguish between an *outright* denial of a security clearance and a *constructive* denial—that is, an indeterminate delay that is tantamount to denial. Whether an agency formally denies a security clearance or constructively denies one by virtue of delay, its refusal to grant access to classified information is immune from judicial review. *See Mowery*, 42 F.4th at 438–39 (The decision to cease a security process, even if not a "black-and-white denial[]," is a "discretionary predictive judgment shielded from judicial review.").

Shiba alternatively invokes the D.C. Circuit's decision in *Rattigan*, which, as we've noted, created an exception to the *Egan* rule for employment-discrimination claims based on "knowingly false security reports or referrals." 689 F.3d at 770. We note for starters that *Rattigan* is not binding authority. We have not adopted a similar exception in our circuit. Nor are we inclined to consider doing so here. Even on its own terms, *Rattigan* does not apply to Shiba's case.

*Rattigan* involved a Title VII retaliation claim by an FBI employee, a black man of Jamaican descent; he alleged that his colleagues reported "unfounded security concerns" to the agency's security division, which in turn prompted an investigation into his continued eligibility for a security clearance.

*Id.* at 765–66. The security division was unable to substantiate the allegations, so he retained his clearance. *Id.* at 766. But he sued nonetheless, claiming that his colleagues' unfounded security referral was retaliatory for his past complaints of racial and national-origin discrimination. *Id.*

A divided panel of the D.C. Circuit held that the plaintiff's claim could proceed. Acknowledging that *Egan* "imposes an absolute bar" on judicial review of security-clearance determinations, *id.* at 771, the panel majority created an exception for "claims based on *knowingly false*" security reports, *id.* at 770. Over a dissent by then-Judge Kavanaugh, the majority concluded that such claims "present no serious risk" of chilling reports of security concerns, so they could "coexist" with *Egan*'s rule. *Id.* In dissent Judge Kavanaugh argued that the majority's exception could not be reconciled with *Egan. Id.* at 773–76 (Kavanaugh, J., dissenting).

It's not clear to us that the *Rattigan* exception is compatible with *Egan*'s reasoning and rule. But we do not need to decide. Shiba's claim is distinguishable. By its terms, *Rattigan* is a narrow exception for claims based on "knowingly false" security reports and referrals. But Shiba's retaliation claim challenges the USCIS's 2020 rescission of its 2019 job offer, which in turn was based on his stalled security clearance. He does not challenge Dorochoff's 2011 OIG referral—at least not in this suit.

Shiba tries to get around this problem by arguing that Dorochoff's 2011 referral, which he contends was false, somehow thwarted the issuance of his security clearance nearly a decade later. That theory strikes us as far-fetched, especially since the OIG investigation did not substantiate Dorochoff's allegations and instead found that Shiba committed different misconduct by lying on his employment application and

misusing his federal position when contacting the United Nations Refugee Agency on behalf of Iraqi refugees.

Regardless, what matters is that Shiba's retaliation claim doesn't fit within the *Rattigan* exception because it does not challenge Dorochoff's 2011 OIG referral. Instead, his suit challenges an unrelated employment action that occurred many years later: the rescission of his 2019 USCIS job offer. So even if we were inclined to adopt a *Rattigan*-like exception, it wouldn't help him.

In sum, Shiba's claim lies within the heartland of *Egan*'s limitation on judicial review, and no recognized exception applies. The district judge was right to dismiss it—although not on jurisdictional grounds. We therefore modify the judgment to reflect a dismissal on the merits for failure to state a claim on which relief can be granted.[2] As modified, the district court's judgment is

AFFIRMED.

---

[2] As we explained in *Matushkina v. Nielsen*, modifying a judgment to a dismissal on the merits does not require a cross-appeal so long as the underlying "jurisdictional dismissal effectively bar[red] relief on the merits in any judicial forum." 877 F.3d 289, 297 (7th Cir. 2017). That is true of the dismissal here. In cases like these, the defendant need not file a cross-appeal because "modifying the dismissal from jurisdiction to merits makes no practical difference"; "[i]t does not expand the defendant's rights." *Id.*